In the Interest of R. L. D., a child, Clarence O. OHLSEN, Director Grand Forks County Social Service Center, Petitioner-Appellee,

v.

L. M. D., also known as L. M. J., mother, Respondent-Appellant,

and

T. H., Respondent.

Civ. No. 9271.

Supreme Court of North Dakota.

May 12, 1977.

F. John Marshall, Grand Forks, c/o Office of Juvenile Commissioner, for appellee.

O'Grady & Anderson, Grand Forks; Harold W. E. Anderson, Guardian ad Litem for R. L. D.

Kessler & Anderson, Grand Forks, for appellant; argued by David Kessler.

PAULSON, Judge.

L.D., the natural mother of R.L.D., a nine-year old female child, appeals from an order of the Juvenile Court of Grand Forks County dated August 5, 1976, which order terminated the parental rights of T.H., the father, and L.D., to the child, R.L.D.

L.D., now 47 years old, gave birth to R.L.D. on November 26, 1966, out of wedlock. T.H., whom L.D. had lived with for two years prior to R.L.D.'s birth, left L.D. shortly after the child's birth, but made support payments of $50.00 per month until R.L.D. was about five years old. T.H. apparently has no active interest in the present action.

L.D. currently resides in a home she purchased in 1970—all mortgage payments were current at the time of the hearing. L.D. has an eighth grade formal education, and has worked primarily as a music teacher—giving piano, accordion, and guitar lessons—but she has also held various other part-time jobs since the birth of R.L.D.

R.L.D. is currently under the temporary care, custody, and control of the director of the Grand Forks County Social Service Center, and resides in a licensed foster home in Grand Forks County, having been so placed by said custodian. R.L.D. came into the temporary custody of the director of the Grand Forks County Social Service Center by order of the Juvenile Court of Grand Forks County dated September 23, 1974, which order followed a hearing held on September 18, 1974, in which it was alleged by the director of the Grand Forks County Social Service Center, and found by the Juvenile Court, that R.L.D. was a deprived child within the purview of the Uniform Juvenile Court Act, as amended, § 27–20–02(5)(a), N.D.C.C.

On August 14, 1975, L.D. submitted a motion requesting that R.L.D. be returned to L.D.'s custody. On August 22, 1975, the director of the Grand Forks County Social Service Center petitioned the Juvenile Court for an amended order of disposition and requested that L.D.'s and T.H.'s parental rights in R.L.D. be terminated. The hearings on both the motion and the petition were held on December 16, 1975. At that time both the motion and petition were withdrawn upon stipulation of the parties, and the order of September 23, 1974, which placed R.L.D. in the temporary custody of the Grand Forks County Social Service Center was continued with the understanding that the Grand Forks County Social Service Center would continue to work with L.D. in order that she might be rehabilitated.

On May 20, 1976, the director of the Grand Forks County Social Service Center again filed a petition for termination of parental rights. The hearing on such petition was held on July 27, 28, 29, and 30, 1976. On August 5, 1976, the Juvenile Court filed the following findings of fact and order of disposition which terminated the parental rights of L.D. and T.H. to the child, R.L.D.:

"*FINDINGS OF FACT*
"I.

"That the above-named minor child is nine years of age, having been born out of wedlock to . . . [L.D.] on the 26th day of November, 1966;

"That the natural mother of said child resides at . . . Grand Forks, North Dakota;

"II.

"That the minor child . . . [R.L.D.] is under the TEMPORARY care, custody and control of the Director of the Grand Forks County Social Service Center, and said child resides in a licensed foster home in the County of Grand Forks, State of North Dakota, having been so placed by said custodian;

"III.

"That the allegations in the Petition have been established in that the child . . . [R.L.D.] is a DEPRIVED CHILD within the purview of the Uniform Juvenile Court Act (Chapter 27–20 of the North Dakota Century Code and Acts, as amended); and

"That the conditions and causes of the DEPRIVATION are likely to continue or will not be remedied and by reason of these continuous or irremediable conditions and causes the child would suffer serious physical, mental, moral or emotional harm if the Petition were not granted; and

"That the Respondent . . . [L.D.] is unable to give the said child proper care, nurture, training and protection; and that it is for the best interest of said child and of this State that all parental rights of the Respondent, and the relationship of parent and child, with reference to said child be terminated.

"*ORDER TERMINATING PARENTAL RIGHTS*
"IT IS HEREBY ORDERED:
"I.

"That the above-named minor child . . . [R.L.D.], comes within the provisions of the Uniform Juvenile Court Act of the North Dakota Century Code and Acts, as amended;

"II.

"That the parental rights of the Respondent . . . [L.D.] and . . . [T.H.], the father of the child, with reference to said child, including the right to care, custody and control of said child, be and the same are hereby forever terminated, thereby terminating all of the rights and obligations of the Respondent . . . [L.D.] and . . . [T.H.] with respect to said child and of said child to or through the Respondent arising from the parental relationship; and

"III.

"It is further ORDERED that the care, custody and control of the child . . . [R.L.D.] continued with the Director of the Grand Forks County Social Service Center for adoptive placement in a suitable home, subject to the further Order of the Court."

■ Our scope of review of decisions made under the Uniform Juvenile Court Act (Ch. 27–20, N.D.C.C.) is broader than in other cases tried to the court and is much like our former procedure of trial de novo. § 27–20–56(1), N.D.C.C.; Rule 81(c), N.D.R. Civ.P.; *In re A.N.,* 201 N.W.2d 118, 121 (N.D.1972). We therefore reexamine

" . . . the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. . . . " § 27–20–56(1), N.D.C.C.

The public purposes basic to the Uniform Juvenile Court Act pertinent to the issues raised in the instant case are set forth in subsections 1 and 3 of § 27–20–01, N.D.C.C., wherein it provides:

"1. To provide for the care, protection, and wholesome moral, mental, and physical development of children coming within its provisions;

"3. To achieve the foregoing purposes in a family environment whenever possible, separating the child from his parents only when necessary for his welfare or in the interest of public safety;

Section 27–20–44, N.D.C.C., provides:

*"Termination of parental rights.—*

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

"a. The parent has abandoned the child;

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; or

"c. The written consent of the parent acknowledged before the court has been given.

"2. If the court does not make an order of termination of parental rights it may grant an order under section 27–20–30 if the court finds from clear and convincing evidence that the child is a deprived child."

Section 27–20–02(5)(a), N.D.C.C., defines "deprived child" to mean:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian;"

■ In the case of *In re H,* 206 N.W.2d 871, 873 (N.D.1973), this court stated:

"Thus, § 27–20–44(1)(b) requires that the evidence establish three factors before a juvenile court may terminate the parental rights of a parent. These factors are: 1) that the child is a 'deprived child' within the purview of the Uniform Juvenile Court Act, Chapter 27–20, N.D.C.C.; 2) that the conditions and causes of the deprivation are likely to continue or will not be remedied; and 3) that by reason of these continuous or irremediable conditions and causes the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." [1]

The burden is on the State, as the party challenging the right of the natural parents to the care, custody, and control of their child, to prove by clear and convincing evidence the existence of all three of the above-stated factors. In *Interest of R.W.B.,* 241 N.W.2d 546, 550 (N.D.1976), and cases cited therein.

Our review being de novo, it is incumbent upon us to review the evidence in the instant case. While the record is voluminous, we have carefully reviewed it, and conclude that the basic facts can be summarized as follows:

---

1. As this Court noted in *McGurren v. S.T.,* 241 N.W.2d 690, 693 (N.D.1976), the fitness of a parent is a fourth factor to be considered at a hearing terminating parental rights. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Kottsick v. Carlson,* 241 N.W.2d 842 (N.D.1976).

—That R.L.D. was born on November 26, 1966, out of wedlock. Her parents are L.D. and T.H. T.H. has no active interest in this case. L.D. is a resident of Grand Forks. Except for short periods of L.D.'s hospitalization for mental illness, R.L.D. was cared for exclusively by her mother from the child's birth until September 23, 1974, when, by order of the Juvenile Court of Grand Forks County, R.L.D. was placed under the temporary care, custody and control of the director of the Grand Forks County Social Service Center, and she has since resided in a licensed foster home in Grand Forks County.

—That L.D. has had a history of recurring mental illness, diagnosed as schizophrenic, dating from the fall of 1971, for which hospitalization and outpatient services have been necessary.

—That L.D. was referred to the Northeast Regional Mental Health and Retardation Center by the Social Security Administration for an evaluation and was found eligible for social security disability benefits which L.D. received until R.L.D. was removed from her custody on September 23, 1974.

—That after finding that R.L.D. was a "deprived child" as defined by § 27–20–02(5)(a), N.D.C.C., the juvenile court ordered the removal of R.L.D. from the custody of L.D. on August 16, 1974, and placed R.L.D. in the temporary care, custody, and control of the Grand Forks County Social Service Center.

—That R.L.D., when first placed in a foster home, exhibited signs of nervousness and improper care, including: scratching herself until she bled; refusal to enter empty rooms alone; unusual fear of guns and knives; and poor eating habits—but that after a few months in a foster home, she overcame these nervous traits and became better adjusted.

—That L.D. has been the recipient of extensive, if not all of the social services available in the Grand Forks area, including: adult foster home services; psychological services; homemaker services; group therapy; and continuous caseworker services—but that the utilization of such services, although effectively provided, have been unsuccessful in controlling L.D.'s emotional and mental problems.

—That L.D., during periods in which she has not been confined, has demonstrated behavior which would seriously affect R.L.D.'s mental and emotional health, namely, attempted suicides, including one occasion in which L.D. shot herself while R.L.D. was in the house; making provisions to buy a casket for herself; and threatening R.L.D.'s life if R.L.D. were not returned to her custody.

—That L.D. does not trust or believe the social workers, psychologists, doctors, or other medical personnel that have come in contact with her, i. e., she alleges that the social workers lied about the type and extent of services rendered to her; she alleges that the hospital nurses poured vinegar on her food during one stay in the hospital and that they forced her to take the wrong pills; she refuses to take any medication when she is released from supervision; she alleges that the only reason she was placed in an adult foster home was so that "they" could force her to take pills; she alleges that none of the doctors and psychiatrists that have treated her really understand her; and she alleges that the only thing that the welfare department is trying to do is to take R.L.D. away from her.

█ The first question which we must answer in this appeal is whether or not R.L.D. is a "deprived child", as defined in § 27–20–02(5), N.D.C.C. (quoted earlier herein). From our review of the files, records, and transcripts of the evidence before the juvenile court, we find that R.L.D. is a "deprived child" and that such deprivation is not primarily caused by the lack of financial means of her parents. The record establishes by clear and convincing evidence that R.L.D. was subjected to severe mental and emotional abuse from 1971 until she was removed from L.D.'s custody on August 16, 1974—because R.L.D., prior to being removed from her mother's custody, was being raised in an environment which encompassed her mother's attempts at sui-

cide, talk of death, mistrust of social service help and psychiatric help, and other less serious manifestations of her mother's mental illness. The record clearly shows that, even with the full utilization of the social services made available to her in the Grand Forks area, L.D. was unable to provide R.L.D. with proper parental care necessary for R.L.D.'s mental and emotional health.

■ Secondly, we must determine whether or not the conditions and causes of R.L. D.'s deprivation are likely to continue or will not be remedied. The record clearly establishes that L.D.'s mental illness is of a recurring nature, and that even while in remission, as at the time of the trial, such mental illness affects her attitudes and beliefs to a degree that would harmfully affect the mental and emotional development of a minor child. Further, we note that L.D. has been unable to maintain her mental illness in remission during the past two years, a period during which L.D. has been freed of the responsibility of caring for R.L.D., and has had available extensive social services and competent psychiatric help. We also note that L.D. does not trust the medical personnel that have treated her; that she feels that none of them understand her; that she feels that nurses give her improper medication; and she refuses to continue to take any medication once released from custody because she feels that medication is harmful to her body. Because L.D.'s mental illness is of a recurring nature and is not held in remission even during periods during which L.D. has had no responsibility for caring for R.L.D., and because L.D. openly mistrusts and resists medical help in the treatment of her mental illness, we find that the conditions and causes of R.L.D.'s deprivation are likely to continue or will not be remedied.

■ Thirdly, we are asked whether R.L.D. will probably suffer serious physical, mental, moral, or emotional harm by reason of L.D.'s recurring mental illness. Our conclusion, drawn from the record before us, is that R.L.D. will probably suffer serious mental and emotional harm if returned to her mother's custody. Although we find

L.D. to be a loving and caring mother, we find that the State has established by clear and convincing evidence that she is now and probably will continue to be unable to provide a suitable mental and emotional environment for the growth and development of a minor child.

In addition to the foregoing substantive issues presented for our review in the instant case, L.D. has also raised three procedural questions for our review. First, L.D. contends that the juvenile court was without jurisdiction to terminate L.D.'s parental rights because the petition for termination of parental rights, dated May 20, 1976, contained no allegation that the causes of R.L. D.'s deprivation are likely to continue or will not be remedied. We disagree.

■ Section 27–20–45(1), N.D.C.C., sets forth the required content of a petition for termination of parental rights, as follows:

"1. The petition shall comply with section 27–20–21 and state clearly that an order for termination of parental rights is requested and that the effect thereof will be as stated in the first sentence of section 27–20–46."

Section 27–20–21, N.D.C.C., provides:

"*Contents of petition.*—The petition shall be verified and may be on information and belief. It shall set forth plainly:

"1. The facts which bring the child within the jurisdiction of the court, with a statement that it is in the best interest of the child and the public that the proceeding be brought and, if delinquency or unruly conduct is alleged, that the child is in need of treatment or rehabilitation;

"2. The name, age, and residence address, if any, of the child on whose behalf the petition is brought;

"3. The names and residence addresses, if known to petitioner, of the parents, guardian, or custodian of the child and of the child's spouse, if any. If none of his parents, guardian, or custodian resides or can be found within the state or if their respective places of residence address are unknown, the name of any known adult relative re-

siding within the county, or, if there be none, the known adult relative residing nearest to the location of the court; and

"4. Whether the child is in custody and, if so, the place of his detention and the time he was taken into custody."

Section 27–20–46, N.D.C.C., in pertinent part, provides:

"*Effect of order terminating parental rights.*—An order terminating parental rights of a parent terminates all his rights and obligations with respect to the child and of the child to or through him arising from the parental relationship. . . . ."

There is no requirement that the petition for termination of parental rights allege that the conditions and causes of any deprivation are likely to continue or will not be remedied. Although there must be a finding that the conditions and causes of any deprivation are likely to continue or will not be remedied before parental rights may be terminated, such is not a jurisdictional requisite that must be alleged in the petition for termination of parental rights. In the instant case, the petition for termination of parental rights fully conformed with the requirements set forth in § 27–20–45, N.D. C.C., and, therefore, the juvenile court had full jurisdiction to order the termination of L.D.'s parental rights.

L.D. next argues that the juvenile court permitted prejudicial error in refusing the motion and request by counsel for L.D. to have R.L.D., who was nine years of age at the time of the termination hearing, to either testify at the hearing or be interviewed by the juvenile court judge in chambers. Such argument is premised upon § 27–20–24(4), N.D.C.C., which provides:

"4. Except in hearings to declare a person in contempt of court, the general public shall be excluded from hearings under this chapter. Only the parties, their counsel, witnesses, and other persons accompanying a party for his assistance, and any other persons as the court finds have a proper

interest in the proceedings or in the work of the court may be admitted by the court. The court may temporarily exclude the child from the hearing except while allegations of his delinquency or unruly conduct are being heard."

We disagree.

The primary purpose of the Uniform Juvenile Court Act is to protect the welfare of the child. The decision of whether or not to subject a child of tender years to such potential stress as would result from such child giving testimony, either in the judge's chambers or in open court, at a hearing for the termination of the parental rights of such child's parents must rest with the discretion of the juvenile court. In the instant case, the juvenile court determined that the value of R.L.D.'s testimony would be outweighed by the distress such testimony would create for R.L.D. From our review of the record, and given the nature of the causes for R.L.D.'s deprivation, we find that the juvenile court did not abuse its discretion by refusing to allow R.L.D. to testify in the instant case.

Finally, L.D. contends that the juvenile court erred in allowing Dr. Leland H. Lipp, a psychologist at the University Medical Center Rehabilitation Hospital in Grand Forks, to testify contrary to his views expressed in the written report he had made one year prior to the hearing in the instant case, dated May 8, 1975. L.D. contends that any observations or evaluations made by Dr. Lipp which were inconsistent with his written evaluation of May 8, 1975, should not have been admitted into evidence. Such argument is based on an alleged failure on the part of the State to supplement responses to interrogatories pursuant to Rule 26(e), N.D.R.Civ.P. We disagree.

Counsel's argument is premised on a duty to update interrogatories which were drawn and served by a prior counsel for L.D., prior to the stipulated withdrawal of a separate and distinct action for the termination of L.D.'s parental rights. Such prior action was dismissed by stipulation of the parties on December 16, 1975. The

instant case was initiated by a petition for termination of parental rights dated May 20, 1976, and is a separate and distinct action from the former petition. Present counsel for L.D. made no effort to renew prior counsel's interrogatories served during the previous action, nor did present counsel for L.D. serve similar interrogatories of his own drafting. We find no duty requiring the supplementation of interrogatories served as part of the discovery process of a separate and distinct action that has been dismissed. Further, § 27–20–29(4), N.D. C.C., provides, in pertinent part:

"4. In hearings under subsections 2 and 3 all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition. . . ."

Such provision clearly shows that our Legislature intended that the juvenile court should consider all relevant evidence bearing upon the issues relating to the proper disposition of a case once the court has determined that a child is a "deprived" child. *Interest of R.W.B.,* 241 N.W.2d 546, 553 (N.D.1976). Furthermore, it is not disputed that Dr. Lipp was noted as a witness for the State in the instant case, and the record shows that Dr. Lipp's examination of L.D. prior to his report of May 8, 1975, was limited to only eight to ten hours, but that he had spent from thirty to forty hours examining her subsequent to his written report of May 8, 1975. We therefore find such testimony to have been properly noticed, and to be competent testimony in a hearing on a petition for termination of parental rights.

The order of the juvenile court terminating the parental rights of L.D. and T.H. is affirmed. Costs shall not be assessed to either party.

ERICKSTAD, C. J., and PEDERSON, VOGEL and SAND, JJ., concur.