In the Interest of F. H., a child.

B. H., Petitioner and Appellee,

v.

W. S., Respondent and Appellant.

Civ. No. 9584.

Supreme Court of North Dakota.

Aug. 22, 1979.

Jack Longert, Legal Assistance of North Dakota, Fargo, for respondent and appellant.

E. Thomas Conmy, III, Fargo, for petitioner and appellee.

SAND, Justice.

An unwed mother, then 19 years of age, placed her female child, born 20 March 1977, with a North Dakota licensed child placement agency. On 4 April 1977 she executed a petition requesting the juvenile court to terminate her parental rights and obligations as well as those of the informally acknowledged father of the child. The juvenile court ordered a hearing to be held before a referee. A petition and summons were served upon the alleged father (William) on 26 April 1977. By letter[1] dated 2 May 1977, William informed the mother's attorney of his intention to resist the termination of his parental rights and to seek custody of the child upon his release from the correctional facility where he was being held. A hearing was held and on 31 January 1978 the juvenile court issued an order terminating the mother's parental rights and continuing the hearing on the termination of William's parental rights to an open date (later date).

A reply to the petition, dated 2 March 1978, and signed by William was served upon the attorney for the mother. The reply stated William believed he was the father of the child and that he had informally acknowledged and declared his paternity.

1. The contents of the letter stated:

"I do not intend to have [the child] my daughter terminated of her parental rights. Because of my present status, I am unable to attend and contest any of the legal proceedings. When I am released from this correctional facility, I will seek legal aid in order to gain custody of [the child] my daughter. Thank you."

The hearing on the question of terminating William's parental rights was set and notice thereof was served upon William by mail on 20 September 1978. William moved for a continuance by written motion which was served on 19 October 1978, the date set for the hearing. The motion for continuance was denied at the hearing.

William's appearance at the hearing was through his attorney, but not personally. After the hearing the court took the matter under advisement and on 7 December 1978 issued detailed findings of fact (some of which were a mixture of fact and law), conclusions of law and an order terminating the parental rights of William. On 18 December 1978 a judgment was issued and entered accordingly. William appealed.

William contended on appeal that the due process clauses of the North Dakota and United States Constitutions were violated in this case on the grounds that:

(a) The statements in the petition were conclusions and devoid of pertinent facts, thereby denying him a meaningful opportunity to prepare his case; and

(b) The court did not grant a continuance so as to permit him to appear personally and allow the court to observe and examine his demeanor and appearance and hear facts necessary to the termination of his parental rights.

William also contended error was committed in the termination of his parental rights when:

(a) Even though William expressed as much interest as a reasonable person would under the circumstances, abandonment was asserted on an involuntary act that occurred before the child's birth and which rendered it impossible for him to support the child; and

(b) Deprivation, and likelihood of continued deprivation, and probability of serious harm were "asserted on evidence revealing a child in presently good condition" and not on a "present or future prognosis as to the fitness of the father."

I

We will first consider the contention relating to the insufficiency of the petition.

In the case of *In Interest of J.K.S.*, 274 N.W.2d 244, 248 (N.D.1979), Justice Vande-Walle noted in a footnote that this court observed in *In Interest of T.M.M.*, 267 N.W.2d 807, 813 (N.D.1978):

"... that a petition in the language of the statute defining a 'deprived child' [27–20–02(5)(a), N.D.C.C.] is conclusory language that does not comply with Section 27–20–21, which requires that a petition 'set forth plainly: ... The facts which bring the child within the jurisdiction of the court, ....' We indicated that such facts are necessary in order to provide notice to respondents so they may prepare for the hearing and participate meaningfully in it."

The petition in the instant case does not merely track the language of the statute but recites some pertinent allegations which, when supported by evidence, would constitute a basis for concluding the child was abandoned and deprived. The petition, in substance, stated that: a 19-year-old unwed mother gave birth to a female child on 20 March 1977; the unwed mother placed the child with a named licensed child-placing agency at Fargo, North Dakota; the unwed mother was never married nor had she cohabitated with a man at the time of conception or birth of the child; the paternity of the child had never been legally established or adjudicated; the mother had not, and did not intend to commence any proceedings to legally establish the paternity of the child; the mother had not received any support payments or promises of support from any man with respect to the child or in connection with the mother's pregnancy; William had informally acknowledged or declared his possible parentage of the child; no person was claiming custody of the child; William had not relinquished his parental rights or consented to the termination of his rights, the mother and William were unable to give the child proper care, nurture and training; and the mother believed it was in the best interest

of the child and the public that proceedings be brought for the termination of parental rights and the child placed in a suitable family home for adoption. The petition concluded with the prayer that proper notice be served on the parties of interest. The petition prayed the court enter an order: terminating the parental rights and obligations in the child of the mother and William; confirming the action of the mother in placing her child with the child-placing agency; granting to the child-placing agency the sole right to the care, custody and control of the child; and appointing the child-placing agency as the agency having full authority to give consent to the adoption of the child, with the same force and effect as if consent were given by the mother as the legal parent of the child.

We recognize the petition contained some conclusions such as the mother and William were unable to provide "proper care, nurture and training" for the child. The petition, however, also contained specific allegations which sufficiently informed William of the nature of the proceedings and his role therein. William relies heavily upon our opinions *In Interest of T.M.M.,* 267 N.W.2d 807 (N.D.1978) and *In Interest of M.L.,* 239 N.W.2d 289 (N.D.1976), as support for his contention. The petition in this case, however, unlike those in the cases cited by William, adequately set out the basic issue. Although the petition must set forth plainly the facts which bring the child within the jurisdiction of the court, we are satisfied the Legislature, with the enactment of Chapter 27–20, North Dakota Century Code, did not intend the courts of this state to revert to technical, common law pleadings, but rather intended to continue the practice of modern day pleading.

Although the petition could have been more specific as to the facts constituting deprivation, it is not required that the petitioner set forth in the petition each piece of evidence to be offered in support of the petition. If William believed the petition was inadequate, he could have moved for a more definite statement under Rule 12(e), North Dakota Rules of Civil Procedure. He failed to make such a motion or in any other manner raise the issue of insufficiency of the petition before the juvenile court. In addition, the record in this case, including William's trial brief, indicates William was well aware of the type of action being brought and the statutory provisions the action was being brought under. An error is not reversible error unless it affects the substantial rights of the parties. *Kunze v. State Farm Mutual Automobile Insurance Co.,* 197 N.W.2d 685 (N.D.1972).

William has failed to show the petition was insufficient. Even if we assume for sake of argument that the petition was insufficient, William failed to raise and preserve the issue of insufficiency before the juvenile court. We conclude William's constitutional rights of due process were not violated by the notice given him in this case.

II

William contended that the court erred in failing to grant his motion for a continuance. This issue involves, and to a degree rests upon, the resolution of the further question of William's right to be personally present at the hearing.

William, through his attorney, moved the court for a continuance until such time as he would be paroled from the Oregon State Correctional Institution. In support of William's motion, an affidavit from the acting chairperson of the Oregon Board of Parole was received. The affidavit, in substance, stated that:

"Unless [William] commits an act constituting serious institutional misconduct in the interim, he will reappear before the Board during the first few days of March, 1979, at which time the Board will order him released on parole. We anticipate that [William] will be so-released within ten days to two weeks after the entry of the parole order."

The United States Supreme Court considered and delineated certain issues concerning the rights of an unwed parent in termination proceedings. In *Stanley v. Illi-*

*nois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court held that a presumption under Illinois law that unwed fathers were unfit parents violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Court determined that under the Due Process Clause, all parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody. The Court also concluded that denying a fitness hearing to unwed fathers while granting such a hearing to other parents was contrary to the Equal Protection Clause.

However, the United States Supreme Court in *Caban v. Mohammed,* —— U.S. ——, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), had under consideration a New York statute permitting an unwed mother to block the adoption of her child by simply withholding her consent, but not giving an unwed father a similar right. Before declaring the New York statute unconstitutional, the Court observed that:

> "In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child. Indeed, under the statute as it now stands the Surrogate may proceed in the absence of consent when the parent whose consent otherwise would be required never has come forward or has abandoned the child. See, *e. g., In re Orlando F.,* 40 N.Y.2d 103, 386 N.Y.S.2d 64, 351 N.E.2d 711 (1976)." 99 S.Ct. at 1768–1769.

In *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), *reh. denied* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511, the Court upheld a Georgia statute which provided that while a father could acquire veto power over the adoption of a child if he had legitimated the child, a father had no veto authority over the adoption of a child he had not legitimated. In reviewing its earlier opinion of *Stanley v. Illinois, supra,* it said that in *Stanley*

> "The Court concluded, on the one hand, that a father's interest in the 'companionship, care, custody and management' of his children is 'cognizable and substantial,' [citation omitted] and, on the other hand, that the State's interest in caring for the children is *'de minimis'* if the father is in fact a fit parent [citation omitted]. *Stanley* left unresolved the degree of protection a State must afford to the rights of an unwed father in a situation, such as that presented here, in which the countervailing interests are more substantial." 98 S.Ct. at 551.

The Court in *Quilloin* held the natural father's substantive due process rights were not violated by the state court's application of a "best interests of the child" standard where the father had not sought to legitimate the child until the adoption petition was filed, some eleven years after the child's birth, and where the child had always been in the mother's custody and lived with the mother and her husband of eight years who sought to adopt the child. The Court also concluded equal protection standards were not violated by providing a degree of veto power for the father of an illegitimate child different from that afforded a married father, even though the married father may be separated or divorced from the child's mother. The court recognized a distinction in the extent of commitment by an unwed father who never exercised actual or legal custody over the child, thus having never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child, and a married father whose legal custody of his children is a central aspect of the marital relationship. The court said even a father whose marriage has broken apart will have borne full responsibility for the rearing of his children during the period of the marriage.

Although the issues before us are not identical to those in *Quilloin,* the principles relating to the welfare of the child as well

as the responsibilities and commitments assumed by the father are applicable.

We now consider whether or not William, an incarcerated respondent, was entitled to be personally present at the hearing, as well as the related question of whether or not he was entitled to a postponement or continuance until he was released from incarceration.

In *Miller v. Turner*, 64 N.D. 463, 253 N.W. 437 (1934), this court, after recognizing a statute which deprived a convict of his civil rights while in prison, nevertheless said a prisoner could maintain an action based on natural rights as distinguished from legal rights. It also determined the prisoner could be sued and, in such case, could defend. The court, however, was not required to, nor did it by implication, determine if a prisoner was entitled to defend in person.

Since this court's opinion in *Miller*, the North Dakota Legislature has provided for the retention of certain civil rights by convicts. Section 12.1–33–02, NDCC, in substance provides that:

> "Except as otherwise provided by law, a person convicted of a crime does not suffer civil death or corruption of blood or sustain loss of civil rights or forfeiture of estate or property, but retains all of his rights, political, personal, civil, and otherwise, including the right to . . sue and be sued . . . ."

This section, however, does not specifically provide that a convict is entitled to appear personally at a civil proceeding.

The California Supreme Court in *Payne v. Superior Court of Los Angeles County*, 17 Cal.3d 908, 132 Cal.Rptr. 405, 553 P.2d 565 (1976), had before it a case in which default judgment was entered against a prisoner who, during his incarceration, was denied appointed counsel and the right to appear personally in court to defend in the civil suit. The court, by a four to three majority, issued a writ of mandate directing the trial court to vacate the judgment against the convict and to allow him meaningful participation at his trial on the merits. The court summarized its holding by stating:

> "Finally, we emphasize the limits of our holding. We have not ruled that all indigents have a right to counsel in civil cases. Nor have we established that indigent prisoners who are plaintiffs in civil actions may secure appointed counsel or the right to appear personally. [Citations omitted.] Neither of those questions is before us, and we do not resolve them here. All we decide is that when a prisoner is threatened with a judicially sanctioned deprivation of his property, due process and equal protection require a meaningful opportunity to be heard. *How that is to be achieved is to be determined by the exercise of discretion by the trial court.*" [Emphasis supplied.] 17 Cal.3d 926–927, 132 Cal.Rptr. 418–19, 553 P.2d 578–79.

The Court of Appeals, Division 2, of the State of California, in *Quaglino v. Quaglino*, 88 Cal.App.3d 542, 152 Cal.Rptr. 47 (1979), took note that its Penal Code, § 2625, provided in part:

> "In any other action in which a prisoner's parental or marital rights are subject to adjudication, an order for the prisoner's temporary removal from such institution and for the prisoner's production before the court *may* be made by the superior court of the county in which such action is pending, or by a judge thereof. . . . ."

After considering the statements of the California Supreme Court in *Payne, supra,* the *Quaglino* court concluded § 2625 was discretionary and did not compel the attendance of the prisoner if the prisoner has a meaningful opportunity to be heard. See also, *Chesapeake Utilities Corporation v. Hopkins*, 340 A.2d 154 (Del.1975).

In a similar vein, the Supreme Court of Oregon in *State ex rel. Gladden v. Sloper*, 209 Or. 346, 306 P.2d 418 (1957), held that the failure to deliver an inmate to the courtroom so he could attend a divorce proceeding did not deprive him of his constitutional rights guaranteed by the Fourteenth Amendment because his ability to give testimony by deposition and to be represented

by counsel were unimpaired.[2] See also, *Bagley v. Bagley*, 57 Misc.2d 388, 292 N.Y. S.2d 796 (1968); *Green v. Boney*, 233 S.C. 49, 103 S.E.2d 732 (1958). The rationale and legal principles expressed in the foregoing cases are applicable to the case before us.

A prisoner's right to be personally present at civil proceedings he ·initiates have been explicitly discussed by other courts. In *Matter of Warden of Wisconsin State Prison, Moeck v. Zajackowski*, 541 F.2d 177, 180 (7th Cir. 1976), the court said:

> "We find no support in the Constitution or in judicial precedent for the proposition that a prison inmate has a fundamental interest in being present at the trial of a civil action to which he is a party, sufficient to outweigh, as a matter of course, the interest of the state in avoiding expense. The due process requirements of the Fifth and Fourteenth Amendments, which guarantee access to the courts, do not grant a prisoner the right to attend court in order to carry on the civil proceedings which he initiates."

The circuit court quoted from the Supreme Court opinion in *Wolff v. McDonnell*, 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974), where that Court stated it had not extended the Fourteenth Amendment Due Process Clause based on access to the courts further than protecting the ability of an inmate to prepare a petition or complaint.

In *Stone v. Morris*, 546 F.2d 730, 735 (7th Cir. 1976), the court, in a civil rights action initiated by a conviction, said:

> "We agree that the right of access to the courts encompasses the right of the inmate to have his case presented, but we do not agree that a plaintiff-inmate must be given the opportunity, in all instances, to appear personally and present his version of the facts. As long as the inmate and his counsel are afforded adequate opportunity to confer confidentially and

to petition the courts about matters in controversy, the right of access is satisfied. *Moeck v. Zajackowski*, 541 F.2d 177 (7th Cir. 1976)."

■ From our review of cases from the various jurisdictions and the principles of law involved, we are compelled to conclude that a convict does not have a constitutional right to personally appear in a civil suit where he has been permitted to appear through counsel and by deposition, if appropriate. Any right to appear personally would have to rest upon convincing reasons and would ultimately be left to the sound discretion of the trial court.

■ In making its determination the trial court may take into account the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition. *Stone v. Morris, supra* at 735–736; *Moeck v. Zajackowski, supra*. The exercise of the trial court's discretion concerning a prisoner's right to appear personally in a civil action will not be overturned by this court in the absence of an abuse of that discretion which we have defined as an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court. *Wall v. Pennsylvania Life Insurance Co.*, 274 N.W.2d 208 (N.D.1979).

■ In the present case, William was represented by able counsel. He was given the opportunity and did appear by deposition. There was no guarantee that even had a continuance been granted, William

---

2. In a case of interest, *In re Anonymous*, 79 Misc.2d 280, 359 N.Y.S.2d 738 (Surrogate's Court 1974), the court held that a statute dispensing with the necessity of consent to adoption by an imprisoned parent was consti-

tutional, and did not violate equal protection or the imprisoned parent's natural rights as a parent where the prisoner's right to defend his parental status was preserved.

would have been paroled on the date indicated by the Oregon Parole Board, as such parole was conditional on William's behavior.

We also believe, in the interest of the child, that a proceeding for the adoption of a child, and especially an infant, is one which should not drag on. Although the adoption in this case is still not complete due to this appeal, the trial court was acting within its discretion in seeking a prompt disposition of the action.

Counsel for William, on appeal, argued that if William had been present at the hearing, he could have refuted the mother's testimony as to his fitness as a parent including a statement that he had been imprisoned as a teenager for possession of LSD. The mother's testimony disclosed the name of the correctional institution and indicated she had obtained her information from William personally. Counsel could have easily verified this statement, and could have requested the trial court for additional time to make such a verification. The failure of William to engage in such discovery was typical. Although more than ample time was available before the hearing for the exercise of discovery, none was engaged in. At the conclusion of the hearing, William did not ask for time to respond or present rebuttal testimony on matters brought up and argued at the hearing. William cannot argue that the refusal to grant a continuance was a denial of due process, when he stood by and failed to avail himself of means that would have protected those same due process rights. We conclude the trial court did not abuse its discretion in denying William's motion for a continuance and that William's right of due process was not violated by that denial.

### III

As a final argument, William asserted the record was insufficient to support the termination of his parental rights under the Uniform Juvenile Court Act. He argued the evidence in this case did not support a showing that his child was deprived as that

term is defined under Chapter 27–20 of the North Dakota Century Code, which contains this State's version of the Uniform Juvenile Court Act. Subsection 27–20–02(5) of that chapter defines a deprived child as a child who:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian;

"b. Has been placed for care or adoption in violation of law; or

"c. Has been abandoned by his parents, guardian, or other custodian."

In addition, § 27–20–44(1), NDCC, provides when parental rights may be terminated. It states:

"The court by order may terminate the parental rights of a parent with respect to his child if:

a. The parent has abandoned the child;

b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; or

c. The written consent of the parent acknowledged before the court has been given."

William asserted the trial court erred in concluding his child was abandoned. He also contended the court's conclusion that the child was deprived and that conditions of deprivation were not likely to be remedied was in error. A deprived child is defined in § 27–20–02(5), NDCC, *supra.*

To prove a child is deprived it is necessary to prove only the conditions set out in one of the subdivisions under subsection (5).

■ Proof of having abandoned the child is sufficient to establish deprivation

for purposes of terminating parental rights under § 27–20–44(1)(a), NDCC. It is not necessary, therefore, to resolve separately the issue of continued deprivation under § 27–20–44(1)(b).

■ In reviewing questions under the Juvenile Court Act, this court is not governed by the clearly erroneous rule, but rather, we reexamine the evidence in a manner similar to a trial de novo, although we do give appreciable weight to the findings of the juvenile court. *Jacobson v. V. S.*, 271 N.W.2d 562 (N.D.1978). We have also said the burden is on the person challenging the right of a natural parent to the care, custody, and control of his child, to prove by clear and convincing evidence the existence of all required factors for termination of parental rights. *In Interest of R. L. D.*, 253 N.W.2d 870 (N.D.1977).

The juvenile court in its findings of fact stated:

"This Court finds as a matter of fact that [the child] is an abandoned child in the relationship as between [William] and [the child]. This Court finds that [William] was legally responsible for the care and support of [the child] who was under the age of eighteen years and unable to support herself by lawful employment. That he willingly failed to furnish food, shelter, clothing, and medical attention reasonably necessary and sufficient to keep the child's life from danger and discomfort and her health from injury. That even though such child may have had such food, shelter, clothing and medical attention furnished through a welfare or charitable institution, this does not excuse [William] from such obligation. Such failure to support a child or pregnant mother has continued for more than three months. That proof of such abandonment has been established to this Court with clear and convincing evidence."

William contended the juvenile court relied heavily upon William's incarceration in reaching its conclusion that the child was abandoned. Section 14–07–17, NDCC, provides that failure to support a child for a period of three months is presumptive evidence of intention to abandon. William argued he was involuntarily incarcerated and because of this was unable to support his child while so incarcerated. He contended that incarceration was an improper consideration for the juvenile court to base a finding that he had failed to support his child for the statutory three-month period.

In *Matter of Rose Lynn G.*, 57 Cal.App.3d 406, 129 Cal.Rptr. 338 (1976), the court held the record was sufficient to sustain the trial court's finding of abandonment by the father of two minor daughters, age 5 and 7. The father had been in jail on various charges for most of the two-year period prior to the commencement of the proceedings to terminate his parental custody and was again in jail at the time of the hearing on the matter. He had never made any attempt to make meaningful contact with his daughters. The court stated that "being incarcerated does not, in and of itself, provide a legal defense to abandonment of children. It was possible to ascertain the children's whereabouts and at least show concern about their welfare; there is nothing in this record which suggests concern on the part of the citee-father." 129 Cal.Rptr. at 349–350.

In *Statt v. Hennepin County Welfare Board*, 287 Minn. 501, 178 N.W.2d 709 (1970), the court in effect held that imprisonment per se was not sufficient to constitute intentional abandonment. Imprisonment could, however, combined with other factors, such as parental neglect and withholding parental affection, lend support to a finding that the parent had relinquished all parental claims to his child and thereby abandoned him. The court took into consideration evidence of the father's behavior pre- and post-incarceration as well as during imprisonment and held that it was sufficient to support a finding of abandonment. The court deemed one visit of about two hours, a Christmas present and a birthday card, were insufficient showings of the father's interest in his children.

In *Hamby v. Hamby*, 264 S.C. 614, 216 S.E.2d 536 (1975), the South Carolina Su-

preme Court held that evidence establishing a father last saw his daughter in September of 1968 between his first and second jail terms, that he wrote to the child from prison on only two occasions, that he voluntarily engaged in conduct which resulted in his being placed in prison, and that he failed to contribute to the child's support, sustained a finding that the father had abandoned the child so that his consent was not necessary for adoption by the child's stepfather.

The petitioner, on appeal, relied upon *Hutson v. Haggard*, 475 S.W.2d 330 (Tex. Civ.App.1971), in which the court had under consideration whether or not imprisonment constituted voluntary abandonment permitting the adoption of a child by the mother's new husband without the father's consent. In concluding the trial court did not abuse its discretion in allowing the adoption without the father's consent, the court noted at 333, that:

> "It was appellant's voluntary acts which brought about his confinement in the penitentiary. There is no hint in our record that any one other than appellant was in any degree responsible for appellant's inability to visit with his child or to contribute to her support. Only his course of criminal conduct has prevented his exercising parental authority or making any parental contribution to the child since she was nine months old. He will not even be eligible for a review of his sentence for another three years.
>
> "Paraphrasing the language of our Supreme Court in *Hendricks* [*v. Curry*] , supra, 401 S.W.2d 796 (Tex.Sup.1966), we are of the opinion that appellant's wilful criminal acts and course of conduct has been such as implies a conscious disregard and indifference to Melissa in respect to his parental obligations that he as a parent owed to her. Thus, we reject the contention that imprisonment does not constitute voluntary abandonment under *Staat*, supra."

*See also, Belitz v. Seekatz*, 570 S.W.2d 218 (Tex.Civ.App.1978).

For additional support for the propositions that incarceration is not a defense to abandonment or deprivation, or that incarceration per se constitutes abandonment or deprivation, *see, In re Levi*, 131 Ga.App. 348, 206 S.E.2d 82 (1974); *In re Welfare of Scott*, 309 Minn. 458, 244 N.W.2d 669 (1976); *Turner v. Adoption of Turner*, 352 So.2d 957 (Fla.App.1977); *Zgleszewski v. Zgleszewski*, 260 Ark. 629, 542 S.W.2d 765 (1976); *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975); *In re Welfare of Doege*, 308 Minn. 104, 240 N.W.2d 562 (1976). *See also,* Annot. 78 A.L.R.3d 712; Annot. 79 A.L.R.3d 417.

William argued abandonment cannot be accomplished before birth. In support of that argument he relied heavily upon *Elliott v. Maddox*, 510 S.W.2d 105 (Tex.Civ.App.1974). In that case the father was convicted and incarcerated prior to the birth of the child. The court rationalized that such imprisonment could not constitute a voluntary act of abandonment of a person who had yet not been born. In the *Elliott* case there are no facts from which it can be inferred that the biological father knew, before he was incarcerated, that the child's mother was pregnant. The Texas court also stated:

> "Had a period of 'voluntary abandonment' been shown to have begun at any time prior to the time Elliott entered the penitentiary perhaps it might properly be deemed to have persisted, at and after such time, so that while he was incarcerated the requisite continuous period of two years' abandonment might be said to have become accumulated." 510 S.W.2d at 108.

The Wisconsin Supreme Court in *State ex rel. Lewis v. Lutheran Social Services*, 68 Wis.2d 36, 227 N.W.2d 643 (1975), said:

> "The facts in this case compel the conclusion that Rothstein abandoned his child before it was born."

The factual situation between the Wisconsin case and the Texas case are different but the point here is that courts have held that a child can be abandoned before birth, contrary to certain language in the Texas Appeals Court opinion. *See also, Matter of Kidder*, 61 Mich.App. 451, 233 N.W.2d 495, 79 A.L.R.3d 417 (1975).

In the instant case William was informed in September 1976 that the unwed girl, who later became the mother, was pregnant. He then left for Texas to attend a vocational school at Dallas but, because of failing grades, he could not continue. He then went to Winston, Oregon, where his sister lived, and in December 1976 he was arrested and pleaded guilty to robbery and was sentenced to five years in the Oregon Penitentiary. William knew about the pregnancy. He was later informed of the birth and the evidence strongly suggests that knowledge of the pregnancy was a material factor in his decision to attend a vocational school in Dallas, Texas. William did not provide for any care, financial or otherwise, to the mother while she was preparing to give birth to the child. Nor did he provide any care, financial or otherwise, to the child after birth. Nor has he shown any particular interest in the child through inquiries, gifts, etc. Although William stated he did not know the whereabouts of the child to provide support, gifts or direct inquiries, the petition for termination and later order of the juvenile court specifically stated the agency who had custody of the child. William could have contacted the agency and through it expressed some interest in the child. Had the mother and child been dependent upon William for survival, it is doubtful that either the mother or the child would have survived from the facts as developed in this case. The facts in the instant case adequately distinguish it from the *Elliott* case.

In the instant case no evidence was introduced which suggests that William committed the crime to obtain finances or other material to help support the child or to obtain food for his own sustenance. He performed the acts which led to his incarceration voluntarily; he was not coerced or under duress to commit those acts; the acts must therefore be deemed to be voluntary. While he may not have committed the act with the specific intent to be incarcerated, nevertheless the reasonable consequence thereof should have been known and accepted. In this respect it is similar to the provisions of § 12.1–04–02(1) and (2) making acts resulting from self-induced intoxication not available as a defense in certain matters.

We conclude that generally incarceration alone is not a defense to abandonment. Also, and on the other hand, incarceration per se does not constituted abandonment. Abandonment, however, may rest upon confinement coupled with other factors, such as parental neglect, withholding affection, no contact, no support, financial or otherwise, and disregard for the general welfare of the child. For comparison of whether or not temporary confinement in a mental institution or absence because of illness constitutes abandonment, *see In Interest of M. L.*, 239 N.W.2d 289 (N.D.1976); *In re J. V.*, 185 N.W.2d 487 (N.D.1971); *In re Masters*, 165 Ohio St. 503, 137 N.E.2d 752 (1956). *See also, Nelson v. Ecklund*, 68 N.D. 724, 283 N.W. 273 (1938).

We have said that in adjudicating the issue of parental rights with respect to children, the primary consideration is the welfare of the child. *Waagen v. R. J. B.*, 248 N.W.2d 815 (N.D.1976); *In re J. V.*, 185 N.W.2d 487 (N.D.1971). Certainly, the child's welfare is the purpose of the proceeding. This is so regardless if the termination proceeding is based on grounds of abandonment, continued deprivation, or consent. Sections 27–20–01, 27–20–44, NDCC.

A court's consideration of a child's welfare in a termination proceeding, however, must be distinguished from the "best interests of the child" test used primarily in custody proceedings. *Keator v. Keator*, 276 N.W.2d 135 (N.D.1979). The "best interest of the child" test involves the weighing of two acceptable alternatives for the rearing of the child. In a termination proceeding, however, the consideration is whether or not the alternative of letting the parent retain his parental rights is acceptable regardless of any competing alternatives. A court makes its determination upon a finding of abandonment, consent, or the parents' continued failure to provide minimum

standards of care. Where either of these three circumstances exist, the welfare of the child dictates that the parent's rights be terminated.

We have said a parent has a fundamental natural right to a child. Although the right is recognized as being of constitutional dimensions, it is not an absolute right. *McGurren v. S. T.*, 241 N.W.2d 690 (N.D.1976). The relationship of parent and child consists of a bundle of rights which are necessary for the preservation of society and must be carefully balanced and jealously guarded. *McGurren v. S. T., supra.* The rights of parents are not proprietary rights but rather are in the nature of a trust reposed in them, subject to their correlative duty to care for and protect the child. The law secures their rights only so long as they shall discharge their obligations. They are not to be enforced to the detriment or destruction of the happiness and well-being of the child. *Pender v. McKee*, Ark., 582 S.W.2d 929 (1979).

We conclude the record, by clear and convincing evidence, supports a finding that William abandoned his child. His failure to discharge the obligations of a parent, both before and after the birth of the child, demand that his parental rights over the child be terminated. We cannot allow the welfare and happiness of the child in this case to be destroyed in the name of protecting rights which have never been exercised and of which corresponding obligations have never been fulfilled.

Prior to oral argument we denied the motion to strike the affidavit of William, dated 26 February 1979, with the provision that we would consider the matter again when the case is heard on its merits. We have again considered the motion and determine that the affidavit was not before the trial court and was objected to in this court. As such, it does not constitute a part of the record on appeal. We reviewed the affidavit and even if it were accepted we do not believe it would change the conclusions reached herein. The motion to strike the affidavit is granted. *In Interest of R. H.*, 262 N.W.2d 719 (N.D.1978).

The judgment of the court is affirmed.

ERICKSTAD, C. J., and PAULSON, VANDE WALLE and PEDERSON, JJ., concur.