Cal ASENDORF, Petitioner
and Appellee,

v.

M.S.S., Respondent and Appellant.

Civ. No. 10423.

Supreme Court of North Dakota.

Dec. 5, 1983.

Richard C. Wilkes, Asst. State's Atty., Minot, for petitioner and appellee.

Clifford C. Grosz, Harvey, for respondent and appellant.

SAND, Justice.

The natural mother, M.S.S. (Marsha), appealed from a juvenile court judgment terminating her parental rights in her three minor children, L.S. (Lee) aged 6, R.S. (Robert) aged 4, and M.S. (Mark) aged 2. Marsha was not married at the time of conception of any of the children and their paternity has not been established. In 1981 Marsha married Roy and they are presently living together. (All names are pseudonyms.)

The Ward County social services office first visited Marsha's home in September 1978 after child abuse and neglect reports were filed against her. Between 1978 and October 1982 social service investigators visited Marsha's home on numerous occasions to inspect the home and to assist Marsha in utilizing available services. Although social services investigators occasionally described Marsha's home as fairly clean, they more frequently described it as very dirty. Investigators reported that they often found animal feces on the floor, human feces on the legs of the children and household furnishings, soiled diapers left laying about, and a general odor of urine throughout the home.

To help Marsha improve her child rearing skills, social service officials assisted Marsha in utilizing the following welfare services: Aid for Families with Dependent Children, food stamps, housing and medical assistance, the Women and Infant Children program, babysitter assistance, homemakers services, nutrition classes, home visits by nurses from the Ward County first district health unit, the Infant Stimulation program, and Headstart. Also, Robert was placed in foster care from 11 January 1980 to 11 February 1980. Robert and Lee were placed in foster care from 11 April 1980 to 30 September 1980, and all three children were placed in foster care on 19 November 1982, where they have remained since.

Despite periodic improvements, investigators reported in September 1982 that conditions in Marsha's home remained basically unchanged.

On 15 November 1982 Ward County juvenile supervisor Cal Asendorf filed a petition for termination of Marsha's parental rights. On 17 November Asendorf also filed a petition for appointment of a guardian ad litem for all three children. The juvenile court appointed a guardian ad litem that same day. The court subsequently held hearings on the petition for termination of Marsha's parental rights on 9, 16, and 28 December 1982.

At the termination hearings, the State introduced the written social service reports depicting the lack of cleanliness in Marsha's home. The State also introduced evidence indicating that the children's mental and physical development was deficient.

Richard Dormont, a Minot pediatrician, had cared for all three children from birth. Dormont testified that the children suffered from a "failure to thrive syndrome." Failure to thrive, Dormont explained, is a form of child abuse which exists when a child with no known organic disease fails to reach normal stages of physical growth. Dormont stated that in eighty to eighty-five percent of such cases the problem is attributed to socioeconomic causes. Dormont testified that he was ninety-nine percent sure that the children's slow physical development was the result of poor socioeconomic conditions.

At the request of Marsha, a second pediatrician examined the children concerning Dormont's diagnosis of the children as failure to thrive. Minot Dr. Michael Holland examined the children on 20 December 1982. Holland stated in a letter submitted to the court that he agreed that "all three children probably [had] nonorganic failure to thrive." Holland had studied the growth charts of Robert and Mark (no recent growth charts were available on Lee) and compared them to his findings. Holland stated that his diagnosis of failure to thrive was strongly supported by Robert's and Mark's increase in weight and height during the three months prior to his examination, a period that coincided with one month of the children's latest foster care. Holland stated that Lee and Robert's failure to thrive produced abnormally small head sizes and a potential for developmental delay. Holland recommended that Mark receive aggressive therapy to prevent similar results.

Keith Gustafson, assistant professor of special education at Minot State College, testified that he was the director of the infant stimulation program in Ward County when Robert was enrolled in the program from February 1980 through August 1981. The program, Gustafson explained, was designed for intervention services to handicapped children ages one to three. Gustafson testified that standardized evaluations of Robert showed that his language development skills were low and that his cognitive developmental skills were in the "sig-nificantly delayed range." When Robert was discharged from the program his cognitive developmental skills had increased by approximately thirty points on the standardized tests to what Gustafson termed a "low average range." However, Gustafson testified that Robert's language skills were still low. According to Gustafson, Marsha later missed several appointments with his office designed to improve Robert's language skills. He also testified that Marsha did not follow through with in-home language development techniques. Finally, Gustafson stated that, from an education standpoint, his test results were consistent with the pediatricians' diagnosis of Robert as failure to thrive.

On 16 February 1983 the juvenile court entered a judgment terminating Marsha's parental rights. On appeal Marsha raised the following two issues: (1) Whether or not the trial court erred in appointing a nonattorney as a guardian ad litem for the children; and (2) Whether or not the trial court erred in terminating her parental rights.

With respect to the first issue, we note initially that the terms "guardian" and "guardian ad litem" have distinct meanings. A guardian is a person who has, or is entitled to, the care and management of the person or property of another, or both. The person for whom a guardian is appointed is normally a minor or an incompetent. *State v. Johnson,* 88 N.W.2d 209, 216 (N.D. 1958). A guardian ad litem, on the other hand, is a special guardian appointed by the court to prosecute or defend in behalf of an infant or incompetent in a suit to which he is a party. Black's Law Dictionary 635 (5th Ed.1979). Despite their distinct meanings, the two words are often used interchangeably, albeit incorrectly.

In the instant case, the State's petition was entitled "Petition for Appointment of Guardian Ad Litem." The text of the petition stated that the "children have no general guardian and are not otherwise legally represented for the purpose of this proceeding." The court appointed a nonattor-

ney to act as the children's "guardian ad litem for the purpose of representing said children in handling all matters ... involving the interests of said children ...." Marsha contended that the trial court erred in appointing a nonattorney as guardian ad litem.

■ The children are not parties to the instant case. They were not required to present evidence or file pleadings. The children are, rather, merely objects of the suit. Generally, if the child has a guardian or a parent, the court is not required to appoint a guardian ad litem because the parent or general guardian, as the case may be, is in a position to employ the services of an attorney if the need arises. *Bartholomay v. St. Thomas Lumber Co.,* 148 N.W.2d 278, 287–288 (N.D.1966). However, in this case the petitioners contended that the children are deprived and the deprivation will continue. This, in effect, meant that the parent was not and is not performing the required parental duties and obligations for the benefit of the children, and, as a result, the children are deprived. This raises the difficult question whether or not the children, in reality, have a parent. The court could have appointed a guardian for this purpose. Rule 17(b), NDRCivP. The function of the guardian ad litem in this case, therefore, was more like that of a guardian. As we recognized above, however, the two words are frequently used interchangeably in legal proceedings. We conclude that the trial court did not err in appointing a nonattorney as guardian ad litem.

Marsha's second contention was that the trial court erred in terminating her parental rights. The applicable statute addressing termination of parental rights is located in North Dakota's Uniform Juvenile Court Act, NDCC Ch. 27–20. NDCC § 27–20–44 provides in pertinent part:

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

. . . . .

b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm."

■ Before a juvenile court may terminate parental rights under § 27–20–44(1)(b), the State must demonstrate by clear and convincing evidence that (1) the child is a deprived child; (2) the conditions and causes of the deprivation are likely to continue or will not be remedied; and (3) by reason of the continuous or irremediable conditions and causes, the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. *Kleingartner v. D.P.A.B.,* 310 N.W.2d 575, 598 (N.D.1981).

A deprived child is one who:

"Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian or other custodian." NDCC § 27–20–02(5)(a).

Further, we have defined proper care to mean those minimum standards of care which the community will tolerate. *In Interest of R.H.,* 262 N.W.2d 719, 724 (N.D. 1978).

■ Our review of decisions under the Uniform Juvenile Court Act is broader than in other cases argued to this Court and is equivalent to the former procedure of trial de novo. The juvenile court's findings are entitled to appreciable weight but we are not bound by them. *Kleingartner, supra* at 578.

■ We first must determine whether or not the children are deprived. We begin by noting the fundamental principle that natural parents have a right to custody of their children. We have described this right as a paramount one because of the need to guard the integrity of the parent-

child relationship. That right, however, is not absolute or unconditional. *Waagen v. R.J.B.*, 248 N.W.2d 815, 818 (N.D.1976). Any doubts should be resolved in favor of the natural parent and parental rights should be terminated only when necessary for the child's welfare or in the interest of public safety. *In re J.Z.*, 190 N.W.2d 27 (N.D.1971); NDCC § 27–20–01(3).

█ The record is replete with evidence indicating that Marsha's home was frequently unclean. Early visits to Marsha's home by social service investigators in 1978 reported dirty clothes and diapers strewn about, dirty dishes stacked atop kitchen countertops, no linen on the beds, human and animal feces on the beds, and a general odor of urine throughout the home. As late as 28 September 1982 the home was described as "very dirty" with "clothes lying everywhere and a foul odor" about the home. Lack of cleanliness of the home, alone, however, does not establish deprivation. *In Interest of R.H.*, 262 N.W.2d 719, 724 (N.D.1978).

█ In examining the question of child deprivation, the critical issue is whether or not a child is receiving minimum standards of care. The testimony of Doctors Dormont and Holland is persuasive in this regard. Both doctors diagnosed all three children as suffering from nonorganic failure to thrive. The evidence indicated that because of their failure to thrive the children were not developing properly, either physically or mentally. Dr. Holland reported that Robert's growth charts showed that his height, weight, and head size were very much below normal, although he had gained significant weight when Holland examined him in December 1982. Mark had a similar growth curve. Lee had no weight gain for seven months, from September 1980 to May 1981. During the next nineteen months, from May 1981 to December 1982, he gained only nine pounds. Robert's preschool handicap teacher testified that when Robert was admitted to the program he was functionally nonverbal and that he uttered only hissing sounds.

In addition to the children's poor physical and mental development, the social service reports reflect that the children suffered neglect. Marsha reportedly often stayed out late at night and did not get up in the morning to care for the children. On several occasions investigators reported that Marsha and Roy appeared intoxicated. Marsha reportedly missed feedings for the children and frequently did not change their diapers or clothes. The children often had diaper rash which had gone unattended. On one occasion investigators discovered bite marks on Robert's right cheek and shoulder which had been left untreated. Dr. Dormont later examined Robert's marks and concluded that they were inflicted by another child, probably Lee.

Although Marsha is of modest means, it does not appear that her economic status is the cause of the children's difficulties. In addition to assistance from numerous welfare services, Marsha has worked at various bars and cafes and at two Minot Air Force Base offices. Roy works as a farmhand near Minot and earns about $800 per month. The record does not indicate, however, how that money is being spent.

The record reflects that the degree of deprivation varied among the children. However, "the fact that all did not display the same symptoms of ailments and maladjustments does not preclude a finding of deprivation as to all" because "all [are] being raised in essentially the same environment." *In Interest of R.H.*, 262 N.W.2d 719, 725 (N.D.1978). We believe that the evidence, when considered cumulatively, clearly and convincingly establishes that the children are deprived.

█ In termination proceedings, however, a showing of parental misconduct without a showing of resultant harm to the children is not sufficient. *Kleingartner v. D.P.A.B.*, 310 N.W.2d 575, 579 (N.D.1981). Therefore, we must next consider whether or not the conditions and causes of the deprivation are likely to continue. In so doing, we may consider previous abuse and deprivation. *Kleingartner, supra*. Evidence of past deprivation, however, is not

alone enough; it must be prognostic. *Waagen v. R.J.B.*, 248 N.W.2d 815 (N.D. 1976).

■ As noted above, Ward County social services officials have been working with Marsha in an attempt to improve her child rearing skills since September 1978. They have met with her at her home and in their offices. Her assistance from various welfare services has been considerable. Despite that assistance and despite periodic improvements, investigators described the home as "very dirty" on 28 September 1982 with "clothes lying everywhere" and "a foul odor" about the air. On 26 October an investigator reported that there was "an odor of filth in the home" and that "it [was] not an appropriate place for children to live in."

Marsha introduced photographs which depict that her home was very clean. The photographs are of little value, however, because it is apparent that they were taken in preparation for trial at a time when the children were receiving foster care.

The record also reflects that Marsha often failed to keep appointments with social service officials [1] and doctors, and that she frequently showed a general lack of concern and cooperation. Keith Gustafson, Robert's infant stimulation program instructor, testified that Marsha did not follow through with in-home techniques designed to improve Robert's verbal skills. Robert's preschool handicap teacher testified that Marsha attended only two of five scheduled parent conferences and that she did not return Robert's communication notebook, various federal forms, or his immunization forms.

Because of the facts above, and because of their durational nature, we believe that clear and convincing evidence exists supporting the juvenile court's determination that the causes of the deprivation are likely to continue. The remaining question is whether or not the children are suffering or will probably continue to suffer serious physical, mental, moral or emotional harm as a result.

■ The pediatricians' diagnoses of the children as failure to thrive together with the testimony of various social service officials indicates that the children have at least suffered serious physical and mental harm. It is apparent the children have not been reaching normal stages of physical growth. Robert, at least, has deficient verbal and cognitive skills. Although not conclusive, the record also reflects some evidence of emotional neglect. One social service report indicated that Lee clung to people who showed him attention and cried when they left.

We believe that the cumulative nature of the evidence clearly and convincingly establishes that the children have suffered serious physical, mental, moral or emotional harm. We also believe that the evidence clearly and convincingly supports the finding that the causes of the children's deprivation are likely to continue. Therefore, the juvenile court judgment terminating Marsha's parental rights is affirmed.

ERICKSTAD, C.J., VANDE WALLE and PEDERSON, JJ., and PAULSON,* Surrogate Justice, concur.

---

1. In *In Interest of M.M.C.*, 277 N.W.2d 281, 286 (N.D.1979), and *Bjerke v. D.T.*, 248 N.W.2d 808, 814 (N.D.1976), we recognized the difficult role of the social service worker, but at the same time acknowledged that the report and testimony of the social worker is treated the same as other evidence but not conclusive on the matter.

* Justice WM. L. PAULSON, served as a Surrogate Justice for this case pursuant to Section 27–17–03, N.D.C.C.