Jeanne R. SEXTON, Petitioner
and Appellee,

v.

J.E.H., a Child, J.E., alleged Father of the above-named J.E.H., C.L.H., Jr., a Child, and C.L.A., alleged Father of the said C.L.H., Jr., Respondents,

and

P.A.H., Mother, Respondent
and Appellant.

In the Interest of J.E.H., A Child, and of C.L.H., Jr., A Child.

Civ. Nos. 10617, 10690.

Supreme Court of North Dakota.

Oct. 23, 1984.

James N. Purdy, State's Atty., Ellendale, for petitioner and appellee.

Stephen M. McLean, Oakes, Guardian ad Litem.

David M. Wheelihan, of Diemert & Wheelihan, Ellendale, for respondent and appellant.

VANDE WALLE, Justice.

P.A.H. (hereinafter "Paula," a pseudonym) has appealed from a judgment terminating her parental rights to two children,

J.E.H. (hereinafter "James," a pseudonym) and C.L.H., Jr. (hereinafter "Charles," a pseudonym). We affirm.

Paula, age 24, is the unmarried mother of James, born February 13, 1980, and Charles, born June 6, 1983. After James received an unexplained head injury that went untreated for approximately one week, both James and Paula were placed in a foster home on November 28, 1980. On approximately December 28, 1980, Paula moved to an apartment and James was returned to her custody in June 1981.

In April 1982, James was removed from Paula's care for a time after Paula left him with persons unknown to either of them with no food, diapers, or instructions. On September 17, 1982, James was again removed from Paula's care after a party in Paula's apartment at which minors were drinking alcoholic beverages, and James was playing with empty beer cans lying on the floor. As a result of that party, Paula was required to serve a jail term upon conviction for the offense of contributing to the delinquency of minors.

After a November 3, 1982, hearing on a petition seeking to have James found to be a deprived child, the juvenile court found, among other things, that: James was developmentally delayed, particularly in speech and language, as a result of Paula's inability to properly care for the child; James was a deprived child; and it was very unlikely that Paula would ever develop the skills necessary to provide proper parental care to the child.

The court did not make a final disposition but retained jurisdiction:

"... so that in the event after further testing of [Paula], it appears that the same conditions exist then that exist now, then this Court will entertain [a motion] that the deprivation proceeding be converted into a termination of parental right proceeding ..."

The court granted the Dickey County Social Services Office custody, care and control of James for a period of 12 months,

with a hearing to be held in the last month of the period for the purpose of:

"... determining whether or not, it is appropriate for consideration to be had of termination of parental rights ..."

Further evaluation of Paula and James was performed on July 6, 1983, the results of which were contained in a report filed with the Dickey County Social Services office on July 18, 1983 by Helen Wilson, clinical neuropsychologist.

Hearings were held October 25 and December 6, 1983, on petitions for termination of Paula's parental rights to James and Charles. A judgment terminating Paula's parental rights to both children was entered and this appeal followed.

The issue in this appeal is whether or not the elements necessary to terminate Paula's parental rights have been established by clear and convincing evidence.

We recently stated several general precepts applicable to review of juvenile court decisions in *McBeth v. J.J.H.*, 343 N.W.2d 355, 358 (N.D.1984):

"In reviewing the evidence presented to the trial court we are not restricted by the standards of Rule 52(a), N.D.R.Civ.P. The Uniform Juvenile Court Act provides that our review of the files, records, and minutes or transcript of the evidence of the juvenile court is similar to the former procedure of a trial de novo. Sec. 27–20–56(1), N.D.C.C. We give the juvenile court's findings appreciable weight, but we are not bound by them. *Asendorf v. M.S.S.*, 342 N.W.2d 203 (N.D.1983); *Kleingartner v. D.P.A.B.*, 310 N.W.2d 575 (N.D.1981). We nevertheless recognize that the trial court had the opportunity to observe the demeanor of the witnesses. *In Interest of D.S.*, 325 N.W.2d 654 (N.D.1982).

"Before a court may terminate parental rights, it must find that the State has established by clear and convincing evidence three factors: that the child is a 'deprived child'; that the conditions and causes of the deprivation are likely to continue and will not be remedied; and that by reason of the continuous or ir-

remedial [sic] conditions and causes, the child is suffering or probably will suffer serious physical mental, moral, or emotional harm. See *Asendorf v. M.S.S.*, *supra;* Sec. 27–20–44(1)(b), N.D.C.C. Although parents have a fundamental right to their child which is of constitutional dimension [*Kleingartner v. D.P.A.B.*, *supra*], parental rights will 'not be enforced to the detriment or destruction of the happiness and well-being of the child.' *In Interest of F.H.*, 283 N.W.2d 202 (N.D.1979)."

Section 27–20–02(5)(a), N.D.C.C., defines a deprived child as a child who:

"Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian; ..."

We have held that proper care means that the parent's efforts must meet those minimum standards of care which the community will tolerate. *In Interest of R.H.*, 262 N.W.2d 719 (N.D.1978).

Section 27–20–44(1), N.D.C.C., provides:

*"27–20–44. Termination of parental rights.—*

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

.     .     .     .     .

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; ..."

The Dickey County Social Services office has provided Paula or James and Charles with the following services: casework counseling, parenting classes, homemaker services, day care for James, medical assistance, transportation services, AFDC,

food stamps, friendly visitor, foster care, speech therapy for James, family planning, crisis intervention/emergency services, and psychological evaluations.

Social workers testified that Social Services has never extended so many hours of services to one case and this is the broadest scope of services they have used; Paula was provided social worker services several times a week since 1980 and on a daily basis since Charles was born; they have seen little improvement in Paula's parenting skills since the services began; Paula would need constant help in raising the children; Paula had said she would give James up for adoption if she could get some money out of the deal; Paula's home does not meet community standards as to cleanliness; Paula could not take care of both children at the same time; Paula's problems in raising James will recur with Charles; and Paula's parenting skills fall below the standard the community will tolerate.

Helen Wilson, a clinical neuropsychologist who had examined Paula and James in September 1982 and July 1983, testified and her evaluation reports on Paula and James were received in evidence. She indicated that: (1) Paula had a verbal I.Q. of 66, a performance I.Q. of 66, a full scale I.Q. of 65, and a memory quotient of 59, all of which are in the mental-defective range; (2) a person with a memory quotient as low as Paula's would be too forgetful to cope and is not competent to handle his own affairs; (3) Paula has a serious impairment of short-term memory, which makes it difficult to retain anything taught her and would give her considerable difficulty parenting; (4) Paula tests at the third-grade level in reading, spelling, and arithmetic; (5) a person with Paula's I.Q. would be impaired in all aspects of mental functioning in making decisions; (6) Paula is immature, egocentric, and demandingly dependent, and a person with this extensive emotional disturbance needs treatment and would not be capable of taking care of someone else unless his own problems were resolved; (7) Paula's parenting skills are so inadequate that she could easily endanger a child's life by accidental neglect or poor judgment; (8) Paula is as much a child as James and needs supervision and care; (9) Paula's condition would apply to any child; (10) she feels Paula wants to get out of her parenting responsibilities; (11) Paula does not understand what a child's needs are on a day-to-day basis; (12) Paula will never be able to stimulate the children so they can be raised in a normal fashion as expected of the average parent; (13) on a Mother/Child Relationship Evaluation, Paula was below the first percentile on the acceptance scale, meaning 99 percent of mothers would respond in a more positive way, and over the 90th percentile on the rejection scale; (14) on the MMPI, which measures psychiatric disorders, Paula endorsed a large number of items that indicated very bizarre thinking and she scored highly on schizophrenic, paranoia, anxiety, and psychopathic deviate scales; (15) Paula loves James in her own way but is unable to show it in an effective way; (16) Paula is unable to be a proper parent to James and is having trouble caring for herself; and (17) nothing in Paula's profile indicates that a change is possible.

Wilson testified that James is significantly delayed in language development, has an activity level bordering on hyperactivity, has an extremely short attention span, and is more destructive than normal children. Wilson also testified:

"[James] has special needs now. And the needs that he has require probably above average parenting skills. And part of the problem is his high activity level and his language impairment. [Paula] would be at a loss to deal with a child with these special needs. Even if [James] did not have special needs, [Paula] would still have problems parenting a child because she would not know how to set limits. She would not know how to discipline. She would not know how to physically care for the child, what constituted adequate nutrition, what kind of problems the child might have that would need attention. She would not be able to reason sufficiently to care for the child

anymore than she would be able to care adequately for herself."

Mary Reinhardt, a speech and language pathologist, testified that home environment is important to development of a young child's verbal skills and that speech therapy for James, who had not been in Paula's care since November 3, 1982, was discontinued August 24, 1983, because he was producing more verbalization and he was in a foster home in which he was given encouragement to produce verbalization.

The expert testimony in support of the petitions to terminate Paula's parental rights was wholly unrefuted. Paula did not seriously contest the termination of her parental rights to James, but concentrated her arguments on the termination as to Charles.

Evidence in support of Paula may be summarized as follows: (1) Paula's neighbors, who moved into the apartment above hers on June 6, 1983, testified that Paula's apartment was clean; Paula talks to the baby, changes him, feeds him, takes care of the baby just about as well as anybody, is patient with him even when he is fussy, and the baby is healthy and alert; (2) Jeanne Sexton testified that she does not know of anything currently wrong with Charles; and (3) Bette Durheim, a social services homemaker, testified that Paula has been better at dressing and bathing Charles than she had been with James; Paula bathes Charles every morning; Paula's homemaking is in some ways better than when she had James; Paula has a good variety of toys for the children; the children show affection toward Paula and have no physical problems; and right now, Charles is a normal, healthy baby.

■ The evidence previously set forth clearly and convincingly establishes that James was, and presently is, a deprived child. It also clearly and convincingly establishes that the conditions and causes of the deprivation are likely to continue and will not be remedied and that by reason of those continuous or irremediable conditions and causes the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. *Asendorf v. M.S.S.*, 342 N.W.2d 203 (N.D.1983); *In re H.*, 206 N.W.2d 871 (N.D.1973).

■ Prognostic evidence is admissible to show whether or not a parent is presently unable to care for a child and whether or not the inability will continue long enough to render improbable the successful assimilation of the child into an improved family environment if the parent's rights are not terminated. *In Interest of R.W.B.*, 241 N.W.2d 546 (N.D.1976); *In re H., supra.* The evidence showed that Paula's lack of ability to care for a child was of long standing and that there was no hope of change.

■ The fact that Charles does not yet display the same symptoms as James does not preclude a finding of deprivation as to him. If Paula's parental rights are not terminated, Charles will be raised in essentially the same environment as James had been. See *In Interest of R.H.*, 262 N.W.2d 719, 725 (N.D.1978). Wilson testified that Paula's condition would apply to any child. She in fact testified that baby Charles is in as much or more danger than James because James is capable of running from a situation, but the baby is defenseless. In *McGurren v. S.T.*, 241 N.W.2d 690, 696 (N.D.1976), we quoted the court's statement in *In re Scarlett*, 231 N.W.2d 8, 12 (Iowa 1975), that "we need not await the happening of tragic events to protect" Charles.

We conclude that all of the elements necessary to terminate Paula's parental rights to James and Charles have been established by clear and convincing evidence. The judgment is therefore affirmed.

ERICKSTAD, C.J., and PEDERSON, GIERKE and SAND, JJ., concur.