402 N.W.2d 912 (1987)
In the Interest of R.M.B., a Child.
Alvin E. CHEADLE, Director, Golden Valley County Social Services, Petitioner and Appellee,
v.
R.M.B., Respondent and Appellee, and
B.M.G., a/k/a B.M.B., Respondent and Appellant, and
R.B. and A.B., Intervenors.
Civ. No. 11267.
Supreme Court of North Dakota.
March 26, 1987.
*913 Orrin B. Lovell, Beach, for petitioner and appellee.
Thomas J. Gunderson, Dickinson, for respondent and appellee.
Wynne and Holm, Rapid City, S.D., for respondent and appellant; argued by John O. Holm.
Mrs. A.B., pro se.
ERICKSTAD, Chief Justice.
B.M.G., formerly B.M.B. [hereinafter Barbara, a pseudonym] appeals from a juvenile court order terminating her parental rights to R.M.B. [hereinafter Rhonda, a pseudonym]. We affirm.
Barbara was 15 years old and unmarried when she gave birth to Rhonda on January 17, 1980. Rhonda's natural father is unknown. Barbara and Rhonda lived together with Barbara's parents in Beach until Barbara was graduated from high school in 1982. Barbara then went to Glendive, Montana, to care for her invalid aunt, and Rhonda remained with Barbara's parents. Barbara subsequently returned to Beach and lived with her parents and Rhonda before moving into her own apartment; however, Rhonda remained with Barbara's parents while Barbara stabilized her life. On January 7, 1983, Barbara married K.G. [hereinafter Kevin, a pseudonym]. Rhonda remained with Barbara's parents after Barbara and Kevin were married, and on November 3, 1983, the district court granted a writ of habeas corpus giving Barbara and Kevin custody of Rhonda.
During February and March 1984 Golden Valley County Social Services [Social Services] investigated allegations that Rhonda was neglected. At that time Barbara and Kevin were getting a divorce and were not living together, and Rhonda was living with Barbara. Ella Huwe, a social worker assigned to investigate the neglect allegations, concluded that the allegations were substantiated. Barbara initially agreed to attend parenting and housekeeping classes *914 and counseling sessions, but she failed to complete those classes. On April 3, 1984, Barbara voluntarily surrendered custody of Rhonda to Social Services, and Social Services placed Rhonda in foster care where she remains.
On April 23, 1984, Barbara informed Social Services that she was leaving for Utah to attend vocational classes at the Clearfield Job Corps Center. Alvin Cheadle, the Director of Social Services, filed a petition, dated April 24, 1984, alleging abandonment and neglect and seeking custody of Rhonda; however, at a hearing on that petition, the parties stipulated that Barbara had voluntarily contacted Social Services and consented to its custody of Rhonda and placement of her in foster care. Based on that stipulation, Rhonda was found to be a deprived child and an order was entered granting Social Services custody of Rhonda for no more than 18 months.
Barbara attended vocational training courses at the Job Corps from April 1984 until June 1985, and again from October 1985 until April 1986. Barbara testified that, from June 1985 until October 1985, she was seeking employment in Utah and did not attend courses at the Job Corps. Barbara also testified that she had regularly telephoned both Social Services and Rhonda when she was living in Utah and made three trips to North Dakota to visit Rhonda. Initially, Barbara also contributed $50 per month from her monthly Job Corps allowance for Rhonda's support but she discontinued support when she left the Job Corps in June 1985 and did not reinstate it when she returned in October 1985. Barbara also testified that, while in Utah, she had not attended parenting and housekeeping classes or counseling sessions. On December 5, 1985, Barbara executed a written consent requesting the court to terminate her parental rights to Rhonda.
Cheadle filed a petition, dated February 10, 1986, seeking termination of Barbara's parental rights. The petition alleged that Barbara had executed a written consent to the termination of her parental rights, that she had abandoned Rhonda, and that she was unable to provide Rhonda with proper care. Barbara withdrew her written consent to termination at an April 1986 hearing on the petition to terminate her parental rights. After that hearing, the juvenile court found that Rhonda was a deprived child and Barbara had abandoned her and entered an order terminating Barbara's parental rights and transferring custody of Rhonda to Village Family Services for purposes of placing her for adoption. Barbara has appealed.
Our scope of review of decisions under the Uniform Juvenile Court Act [Ch. 27-20, N.D.C.C.] is governed by Section 27-20-56(1), N.D.C.C., which provides that our review is based upon the files, records, and transcript of the evidence presented to the juvenile court, giving appreciable weight to the findings of the juvenile court. We are not limited to determining whether or not the juvenile court's findings are clearly erroneous, but instead review the evidence in a manner similar to the former procedure of trial de novo. In Interest of J.K.S., 356 N.W.2d 88 (N.D.1984). Although we are not bound by the juvenile court's findings, we nevertheless recognize that it had the opportunity to observe the witnesses' demeanor whereas we have only the cold transcript before us. Asendorf v. M.S.S., 342 N.W.2d 203 (N.D.1983); In Interest of D.S., 325 N.W.2d 654 (N.D.1982); Kleingartner v. D.P.A.B., 310 N.W.2d 575 (N.D.1981).
Pursuant to Section 27-20-44(1), N.D.C.C., the juvenile court may terminate parental rights if:
"a. The parent has abandoned the child;
"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; or
"c. The written consent of the parent acknowledged before the court has been given."
*915 Initially, Barbara contends that the juvenile court improperly admitted her written consent to termination into evidence because she did not acknowledge that consent at the termination hearing. In In Interest of R.A.S., 321 N.W.2d 468 (N.D.1982), we applied the Schuh v. Allery, 210 N.W.2d 96 (N.D.1973), rationale regarding admissibility of evidence in a non-jury case to parental termination proceedings. In this case the juvenile court acknowledged that Barbara had withdrawn her written consent and based its decision to terminate Barbara's parental rights on abandonment and deprivation and not upon that withdrawn consent. A careful perusal of the juvenile court's findings of fact and order indicates that it did not rely on the withdrawn consent to terminate Barbara's parental rights. Thus, we need not decide if the juvenile court erred in admitting the written consent into evidence because error, if any, would not be prejudicial.
Barbara contends that there was insufficient evidence presented to the juvenile court to clearly and convincingly establish abandonment or deprivation.
The evidence must clearly and convincingly establish abandonment or the elements of deprivation before the juvenile court may terminate parental rights on either of those basis. In the Interest of J.K.S., 356 N.W.2d 88 (N.D.1984); Pritchett v. Executive Director of Social Service Bd., 325 N.W.2d 217 (N.D.1982).
In Pritchett, supra, we discussed the requisite elements of abandonment within the context of the termination of parental rights in an adoption proceeding. See also Matter of Adoption of Gotvaslee, 312 N.W.2d 308 (N.D.1981). In Pritchett, supra, we said that an intent to abandon, which may be inferred from a parent's conduct, is necessary to establish abandonment and that abandonment is a question of fact. We also enunciated examples of conduct probative of abandonment including the parent's contact and communication with the child; the failure to pay support; the attitudes, conduct, ability, and other matters relating to the parent's duties, responsibilities, and care for the child; and the parent's presence, love, care, and affection.
Barbara asserts that the following conduct and contacts with Rhonda establish that she did not intend to abandon Rhonda: (1) her three trips to North Dakota to see Rhonda; (2) her contributions for Rhonda's support on a marginal income; (3) her monthly telephone calls to Social Services discussing her progress and concerns for Rhonda; and (4) her telephone calls to Rhonda. We disagree.
Barbara testified that while she was in Utah she returned to North Dakota three times. In August 1984 she returned to North Dakota for about one week and saw Rhonda once for approximately one hour. During Christmas 1984 Barbara returned to North Dakota for three weeks and saw Rhonda twice for approximately one hour each visit. In June 1985 Barbara returned for three or four days for her sister's wedding in Glendive, Montana, and saw Rhonda at the wedding rehearsal and reception. During that trip, Barbara and Social Services had made arrangements for Rhonda to meet Barbara at the bus station in Dickinson; however, Barbara got off the bus in Glendive and did not show up in Dickinson. Barbara also admitted that she never wrote or sent cards to Rhonda.
Barbara further testified that she telephoned Social Services regularly concerning her progress at the Job Corps and concerning Rhonda's well-being. Huwe testified that Barbara initially called Social Services monthly about her progress at the Job Corps and only occasionally asked about Rhonda. Huwe further testified that Barbara did not call Social Services after August 1985. Barbara testified that she did not remember the exact number of phone calls she made to Rhonda at the foster home. However, the foster parents kept a record of Barbara's telephone calls to Rhonda, and they testified that she called Rhonda seven times between April 1984 and August 1985.
*916 Delores Friedt, a social service worker, testified that she received a phone call from Barbara during August 1985, in which Barbara stated that she wanted to voluntarily terminate her parental rights to Rhonda. Friedt testified that she advised Barbara to consult her lawyer and explained to her that she should not tell Rhonda. Although Barbara denied telling Rhonda, the foster parents testified that, in an August 1985 telephone call, Barbara did tell Rhonda and that she became upset after that call. Although Barbara testified that Social Services told her not to telephone Rhonda, Huwe testified that that request was made after Barbara's August 1985 telephone call to Rhonda.
Barbara had also initially provided support for Rhonda from her monthly allowance at the Job Corps. She discontinued support when she left the Job Corps in June 1985 because she did not receive a monthly allowance when she was not in the Job Corps. After returning to the Job Corps in October 1985, she did not reinstate her support to Rhonda.
We believe that Barbara's contacts with Rhonda were, at best, minimal, and her conduct demonstrates her failure to commit herself to a parent-child relationship.
Barbara blames Social Services for her minimal contacts with Rhonda and asserts that Social Services did not make an effort to place Rhonda in foster care in Utah which would have provided her with more opportunities to see Rhonda. Social Services did contact the appropriate authorities in Utah concerning a transfer to Utah; however, Social Services determined that a transfer would not be best for either Barbara or Rhonda and would be reconsidered when Barbara completed parenting classes, which she did not do. Moreover, Barbara did not fully avail herself of the opportunities to see Rhonda when she did return to North Dakota, and her remaining contacts with Rhonda were minimal.
Based on our de novo review of the record and giving appreciable weight to the findings of the juvenile court and its opportunity to observe the demeanor of the witnesses, we conclude that the record clearly and convincingly establishes abandonment. Pursuant to Section 27-20-44(1)(a), N.D.C.C., abandonment is sufficient to terminate parental rights; however, because the juvenile court also terminated Barbara's parental rights pursuant to Section 27-20-44(1)(b), N.D.C.C., we will examine the evidence presented to the juvenile court within the framework of that subsection.
Barbara contends that there was insufficient admissible evidence to clearly and convincingly establish that Rhonda was deprived within the meaning of Sections 27-20-44(1)(b) and 27-20-02(5), N.D.C.C.
First, Barbara contends that the juvenile court erred in admitting into evidence Huwe's testimony that Rhonda was deprived. Barbara contends that Huwe was not qualified to give an expert opinion that Rhonda was deprived when she was placed in foster care and that Rhonda would continue to be deprived if she was returned to Barbara. Barbara also contends that, in forming her opinion, Huwe improperly relied on a psychological examination and evaluation of Rhonda by Dr. Barry Johnson.
Huwe testified that she was a licensed social worker who had attended several seminars regarding child abuse, neglect, and deprivation. She also testified that she had worked for Social Services in Beach from January 1984 until January 1986 and handled Rhonda's file. She further testified that, in her field, she relied on reports from other people, including psychological reports.
We believe Huwe's testimony was sufficient to establish her background and qualifications to express her opinion that Rhonda was deprived. N.D.R.Evid. 702, 704. Barbara had the opportunity to cross-examine Huwe on the basis of her opinion. N.D.R.Evid. 703, 705. We conclude the juvenile court did not err in admitting Huwe's testimony that Rhonda was deprived when she was placed in foster care and that she would continue to be deprived if she was returned to Barbara.
*917 Next, we turn to Barbara's argument that the evidence was insufficient to establish deprivation. In order to sustain a termination of Barbara's parental rights based on deprivation, the evidence must clearly and convincingly establish that (1) Rhonda is a deprived child; (2) the conditions and causes of the deprivation are likely to continue and will not be remedied; and (3) by reason of the continuous irremediable conditions and causes, Rhonda is suffering, or will probably suffer serious physical, mental, moral or emotional harm. Section 27-20-44(1)(b), N.D.C.C.; In Interest of J.K.S., supra.
Section 27-20-02(5), N.D.C.C., defines a "deprived child" as a child who:
"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian;

* * * * * *
"c. Has been abandoned by the child's parents, guardian, or other custodian;..."
Abandonment alone is sufficient to establish that a child is deprived within the meaning of Section 27-20-02(5)(c), N.D.C.C. In Interest of F.H., 283 N.W.2d 202 (N.D.1979). However, in this case we also believe the evidence presented at the termination hearing established that Rhonda was "without proper parental care or control... or other care or control" within the meaning of Section 27-20-02(5)(a), N.D.C.C. We have defined proper parental care as the minimum standard of care which the community will tolerate. In Interest of L.N., 319 N.W.2d 801 (N.D.1982).
In termination proceedings, due process and notice requirements prohibit the juvenile court from taking judicial notice of testimony in proceedings where termination was not an issue; however, when the termination hearing is a culmination of prior proceedings, the juvenile court need not operate in a vacuum as to the results of those proceedings. McBeth v. J.J.H., 343 N.W.2d 355 (N.D.1984); In Interest of J.K.S., 356 N.W.2d 88 (N.D.1984). In the previous proceeding in this case, Barbara voluntarily surrendered custody of Rhonda to Social Services.
In In Interest of J.S., 351 N.W.2d 440 (N.D.1984), we said that the voluntary surrender of temporary custody of a child to Social Services is an admission that, at that time, the parent is unable to provide the child with proper parental care. A parent's voluntary surrender of custody when that parent is unable to properly care for the child is commendable conduct; however, our analysis must also focus on proper parental care for the welfare of the child. In Interest of V.J.R., 387 N.W.2d 499 (N.D.1986).
Delores Friedt testified that, when Rhonda was placed in foster care, she had emotional and developmental problems including "acting out and pretending and playing that she was an animal." Friedt conducted individual play therapy with Rhonda from July 1984 until February 1986 and observed that Rhonda was initially very confused and upset and would "carry on as a puppy or a dog or a horse or a lamb" for the entire therapy session. Friedt testified that Rhonda eventually became more trusting and achieved levels of development not present before she was placed in foster care.
At the termination hearing, Barbara testified concerning her future plans:
"The plans I have for her at the present ime [sic] is if I'm allow [sic] to retain custody of her, I plan on finishing out at Job Corps and the time that I am out there, I have asked my mother to watch her for me until I can get stabilized to where I can raise her myself."
In effect, Barbara testified that she was not "stabilized" to the point where she could provide Rhonda with proper parental care. In In Interest of J.K.S., supra, we recognized that no arbitrary time frame or amount of effort is required or appropriate *918 to help parents establish an adequate environment for children before a termination of parental rights is sought. However, we said that long term and intensive treatment is not mandated if it cannot be successfully undertaken in a time frame that would enable the child to return to the parental home without causing severe dislocation from emotional attachments formed during foster care. We believe those observations are also appropriate in this case.
Barbara's minimal contacts with Rhonda and the failure to take parenting and housekeeping classes and counseling sessions are also related to whether or not Rhonda is a deprived child. In In Interest of J.K.S., 356 N.W.2d 88 (N.D.1984), the mother sporadically attended parenting classes and had 25 visits with the child between a 1981 review hearing and a 1983 termination hearing. A home study established that the home was clean but was not recommended for permanent placement because of frequent moves and perceived problems between the mother and her husband. In that case we concluded that the evidence clearly and convincingly established that the child was a deprived child. Similarly, in this case, we believe the minimal contacts and failure to take parenting classes provide further support for the conclusion that Rhonda is a deprived child.
Based on the foregoing, we conclude that the evidence presented at the termination hearing clearly and convincingly establishes that Rhonda is a deprived child within the meaning of Section 27-20-02(5)(a), N.D.C.C.
Barbara also contends that there was insufficient evidence to establish that the causes of deprivation would continue. She asserts that Social Services did not believe the circumstances warranted termination when she voluntarily placed Rhonda in foster care in 1984 and, since that time, her parenting skills have improved. She also asserts that there was no evidence to establish that her parenting skills had deteriorated or that she would be unable to care for Rhonda in the future.
Evidence of past deprivation is not sufficient to terminate parental rights; rather, there must be prognostic evidence. McBeth v. J.J.H., supra. In In Interest of J.S., 351 N.W.2d 440 (N.D.1984), we defined prognostic evidence as evidence that forms the basis for a reasonable prediction as to future behavior.
A finding of deprivation can be made even though a parent has not had custody of the child if there is sufficient prognostic evidence to establish that the parent is presently incapable of providing parental care and that inability will continue long enough to make it improbable that the child could be successfully assimilated into a family if parental rights were not terminated. Waagen v. R.J.B., 248 N.W.2d 815 (N.D.1976).
In examining evidence as to future behavior, Barbara's testimony about her plans for the future is significant. Moreover, Huwe testified that Barbara agreed to attend parenting and housekeeping classes and counseling sessions in 1984 but was uncooperative at that time. Barbara admitted that since 1984 she had not taken parenting or housekeeping classes or counseling sessions. Although lack of parental cooperation is insufficient by itself to establish deprivation, it is pertinent to the issue of whether deprivation will continue. In Interest of V.J.R., 387 N.W.2d 499 (N.D.1986). We have recognized the dangers of allowing social workers to determine how a family will be run, but, in determining the likelihood of continuing deprivation, a juvenile court may consider a parent's cooperation, or lack thereof, with social workers. McBeth v. J.J.H., supra.
We conclude that the evidence at the termination hearing clearly and convincingly established a basis for a reasonable prediction that the causes of deprivation would continue.
Barbara's statement of issues in her brief to this court also claims there was insufficient evidence to establish that, by reason of the continuous and irremediable conditions and causes, Rhonda is suffering *919 or would probably suffer serious physical, mental, moral, or emotional harm. However, Barbara did not develop that argument any further in her brief. Nevertheless, we have reviewed the record, and we conclude that it clearly and convincingly establishes that Rhonda is suffering or would probably suffer serious physical, mental, moral, or emotional harm.
Based on our de novo review of the record and giving appreciable weight to the findings of the juvenile court and its opportunity to observe the demeanor of the witnesses, we conclude the evidence presented at the termination hearing clearly and convincingly establishes deprivation within the meaning of Section 27-20-44(1)(b), N.D.C.C.
The order terminating Barbara's parental rights to Rhonda is affirmed.
GIERKE and MESCHKE, JJ., concur.
VANDE WALLE, J., concurs in the result.
LEVINE, Justice, concurring and dissenting.
I concur in that portion of the majority opinion affirming the order of termination under North Dakota Century Code § 27-20-44(1)(b). I dissent from the majority's analysis of abandonment and its conclusion that the record clearly and convincingly establishes abandonment so as to justify termination of parental rights under NDCC § 27-20-44(1)(a).
Usually, when there is an issue of abandonment, there is a parent who has had essentially no contact with either the child or the custodian of the child. See, e.g., Pritchett v. Executive Director of Social Service Bd., 325 N.W.2d 217 (N.D.1982). Here, Barbara paid support for her child for all but a very few months on a marginal income and on a voluntary basis. Had she intended to abandon the child, she certainly would not have spent a significant portion of her modest income on the child. In addition, she called Social Services regularly. Why would she bother to call the custodian of her child every month unless she were interested in maintaining some connection, through the custodian, with that child? She simply would have remained in Utah incommunicado with Social Services and the child. Yet, she did neither. She called Social Services. She called the child. She called the foster parents. She visited the child. I infer no intent to abandon from such contacts. Everything is relative and under the circumstances of this case, I do not believe that Barbara's contacts with her child or the custodian of that child were so minimal as to warrant a finding of abandonment. Besides, there is a strong fundamental relationship between a parent and child which is not to be lightly tampered with. Pritchett, supra. At the very least, abandonment is ambiguous under the circumstances of this case, and the benefit of the ambiguity should inure to the maintenance of the parent-child relationship, not to its destruction. In determining whether or not there has been abandonment, we should not be judging whether the parent has been a good or attentive parent but whether she has demonstrated any indicia of parenthood. Providing support and keeping in steady contact with Social Services are more than sufficient to indicate an intent not to abandon.
The majority also concludes that Barbara's conduct demonstrated her "failure to commit herself to a parent-child relationship." Does that mean that whenever a parent voluntarily turns her child over to Social Services in order to accomplish what cannot otherwise be done, a better life, she abandons that child or does it mean that there is some sort of limitation period, in this case, two years, after which time, regardless of interim support or telephone calls or visits, there arises this failure to commit to a parent-child relationship?
This failure to commit to a parent-child relationship is a new definition of abandonment and I wish I knew whether it meant a failure to commit now or in the future, and if in the future, when? That way, parents striving to improve their lot in life would have some indication of the risks involved *920 in retaining or regaining custody of their children.
Abandonment and continuing deprivation are separate grounds for terminating parental rights, although the factors considered under each may overlap. The inquiry under deprivation focuses on the quality of parental care, present and future. See McBeth v. J.J.H., 343 N.W.2d 355 (N.D.1984). Proper parental care includes providing the stable environment in which the child feels secure and able to form attachments without fear of separation. See McBeth, supra at 360. Because I agree that the child should not be subjected to further uncertainty while her mother is getting herself "stabilized," I concur in affirming the order of termination on the ground of continuing deprivation.