**In the Interest of L.J. and R.J., Children.**

**Melanie HEITKAMP, Petitioner and Appellee,**

v.

**L.J. and R.J., Children; William D. Schmidt, Guardian ad Litem; and the Executive Director of the North Dakota Social Services Board, Respondents,**

**K.J., Mother, Respondent and Appellant.**

**Civ. No. 880001.**

Supreme Court of North Dakota.

Feb. 20, 1989.

Thomas M. Disselhorst (argued), Bismarck, for respondent and appellant.

Merle Ann Torkelson (argued), State's Atty., Washburn, for petitioner and appellee.

Joseph Cichy, Bismarck, on briefs, for Guardian ad Litem.

LEVINE, Justice.

K.J. (hereinafter "Kay," a pseudonym), the mother of the minor children, L.J. (hereinafter "Loren," a pseudonym), and R.J. (hereinafter "Randy," a pseudonym), appeals from a juvenile court order terminating her parental rights. We affirm.

Of the five children born to Kay and her deceased husband B.J. (hereinafter "Bob," a pseudonym), two, Randy and Loren, are mentally retarded. McLean County Social Services has had a long history of involvement with the family. Since 1980 twenty-one abuse and neglect reports were filed; fifteen were substantiated. These reports concerned, among other things, lack of supervision, nutritional and emotional neglect, inadequate clothing and shelter, and inadequate housekeeping.

A deprivation petition was filed on behalf of all five children. After a hearing on April 1, 1985, custody of the five children was placed in McLean County Social Services. Randy and Loren were placed in foster care, to be returned to their home in eighteen months if the parents corrected the conditions in the home and participated in various programs of Social Services aimed at improving parental care.

A petition for termination of parental rights with regard to Randy and Loren was filed on May 21, 1986 alleging little or no progress on the part of the parents to adequately provide for Randy and Loren. The parents entered into a stipulation, agreeing to rectify the problems, but through the next year and one-half custody remained with McLean County Social Services. After considerable procedural maneuvering, a hearing was held on the petition to terminate. The juvenile court terminated Kay's parental rights, finding that Randy and Loren were deprived and that the deprivation was likely to continue or would not be remedied. Kay appealed.

■ In order for the court to terminate parental rights, the State must show by clear and convincing evidence that: (1) the child is a "deprived child"; (2) the conditions and causes of deprivation are likely to continue or will not be remedied; and (3) by reason of the continuous or irremediable conditions and causes, the child is suffering or will probably suffer serious physical, mental, moral or emotional harm. *See* NDCC § 27–20–44; *In Interest of J.A.L.*, 432 N.W.2d 876, 878 (N.D.1988); *Bernhardt v. K.Q.* 423 N.W.2d 803, 803 (N.D. 1988).

■ In reviewing the decision of the juvenile court to terminate parental rights, we examine the evidence in a manner similar to trial de novo. *In Interest of C.S.*, 417 N.W.2d 846, 847 (N.D.1988). Our review is based upon "files, records, and minutes or transcript of the evidence of the juvenile court." NDCC § 27–20–56(1). We afford the juvenile court's findings appreciable weight, but we are not bound by them. *Id.*; *In Interest of A.M.C.*, 391 N.W.2d 178, 179 (N.D.1986). We recognize, however, the juvenile court's opportunity to observe the demeanor of the witnesses. *In Interest of J.S.*, 351 N.W.2d 440, 441 (N.D.1984).

### 1. Deprivation

The juvenile court determined that Randy and Loren are deprived. Under NDCC § 27–20–02(5)(a), a deprived child is one without proper parental care or control, subsistence, education and the "deprivation is not due primarily to the lack of financial means" of the parents.

■ Kay acknowledges that some deprivation exists, but argues that the deprivation is due to her lack of financial resources. The evidence reveals deprivation that has little to do with finances, such as lack of supervision of the children and lack of attention to the physical, emotional and educational needs of the children. There was testimony that their home environment contributed significantly to Randy and Loren's severely delayed language and social skills. There is abundant evidence in the record to establish deprivation not primarily due to lack of financial resources. *See In Interest of D.S.*, 325 N.W.2d 654, 660 (N.D.1982).

### 2. Continuing or Unremedied Deprivation

The juvenile court found that the conditions and causes of deprivation were likely to continue or not be remedied. In finding that there would be continuing deprivation if the children were returned to Kay because of her inability to meet the minimum standard of parental care, the juvenile court explained that "[t]he minimum stan-

dard of care must, of necessity, take into consideration the needs of the child. The minimum standard of care for a special needs child is almost a maximum standard."

Kay contends that the juvenile court violated her constitutional right to parent her children by requiring a "maximum standard" of care for special needs children under which "virtually any parent ... [would be] incapable of providing the level of care necessary."

■ That the special needs of children are relevant to a determination of whether there will be continuing or unremedied deprivation is a clearly established principle. *See Jacobson v. V.S.*, 271 N.W.2d 562 (N.D. 1978); *Bjerke v. D.T.*, 248 N.W.2d 808 (N.D.1976). *Cf. In Interest of J.A.L.*, *supra*. Randy and Loren have special educational needs and Randy has special medical needs as well.

■ It is also well established that parents have a fundamental right to their children which is of constitutional dimension. *Kleingartner v. D.P.A.B.*, 310 N.W. 2d 575, 578 (N.D.1981). Because of their constitutional protection, parental rights may not be terminated merely because a parent lacks the skill to optimize a normal child's potential. *In Interest of L.N.*, 319 N.W.2d 801, 805 (N.D.1982). However, a parent's constitutional right is not absolute. *Kleingartner, supra*. Thus, a parent must provide care that satisfies the minimum community standards. *Asendorf v. M.S.S.*, 342 N.W.2d 203, 206 (N.D.1983).

■ The juvenile court in effect concluded, with regard to a special-needs-child, that minimum community standards require parental care that will reasonably contribute to the limited potential of the special-needs-child in order to obviate the drastic and permanent consequences of lesser efforts. We conclude the juvenile court applied the appropriate standard and asked the appropriate question: whether Kay can "now live up to the minimal standard and meet the emotional, physical, developmental and educational needs of these two boys?"

■ We are sensitive to Kay's argument that no parent is capable of providing the level of care necessary to meet the minimum community standard for parenting a special-needs-child. However, we believe she exaggerates the implications of such a standard. It can hardly be questioned that some children require more care and attention and skill in the art of parenting than do others. The requisite care and control called for by a minimum standard of parenting must necessarily fluctuate with the kind of children being parented. There is no absolute standard. In the case of the special-needs-child, the minimum care that a community will tolerate must necessarily include not only providing basic necessities of food, shelter, and clothing, but also providing the quantum of supervision, supportive education and nurture that will permit the child's reasonable development given the child's reasonable potential. A parent is not expected to do more than to provide the care and control necessary under the circumstances. When a child's potential is limited, so is the leeway of a parent to meet minimum standards. We thus conclude that the juvenile court did not violate Kay's constitutional right to parent.

The record is dramatic in its exposition of both the degree of the deprivation suffered by Randy and Loren as well as the extent of their special needs. We recount it in more detail than usual because it underlies our reasons for rejecting Kay's arguments that she should be given an opportunity to receive Randy and Loren into her home.

When Randy was first placed in foster care on April 1, 1985, he was diagnosed as mentally retarded with an IQ of 60. He was nine years old but functioned at the mental level of a three-year-old child.

Grace Westman, the foster care provider, testified that when Randy first arrived at her home he spoke unintelligibly, did not know how to sit at a table, and ate with his hands. She also testified that he had a severe bed-wetting problem and that because he was aggressive and had no sense of pain, he needed constant supervision.

In the two and one-half years Randy was in her home, Ms. Westman daily practiced basic skills with Randy, reinforcing what he learned in the special education program at school. Randy's speech and reading skills improved dramatically from reading very little to his current first or second grade level. Randy's special education teacher attributed this substantial improvement to the reinforcement Randy received at the foster home.

While in foster care, Randy was diagnosed as suffering from asthma and allergies. Randy now receives medication regularly, and a carefully monitored menu. Ms. Westman testified that Randy's medical condition requires that she regularly clean areas that ordinarily would not receive much attention, such as heat registers, the areas under the refrigerator and furniture, and the furniture itself.

Loren was four and one-half years old when he was placed in foster care. He was diagnosed as mildly mentally retarded, with an IQ of 60. When Loren arrived at the Westman home he was aggressive and hyperactive. He could not recognize dangerous situations and therefore needed constant supervision. Loren spoke in grunts, ate with his hands, and when food was spilled, he attempted to eat it off the floor. Loren was not toilet trained. He walked into objects, staring at them without any recognition.

Within two weeks of arriving at the foster home, Loren was toilet trained. Loren participated in a home-bound program before he started school and Ms. Westman consistently reinforced these skills. Loren progressed from uttering grunts to using three-word sentences, and can now understand the names of things and follow directions. Loren's teacher testified that when he started school, his language and social skills were severely delayed and although he was six years old, his language skills were at an eighteen-month-old level. She testified that at the end of the school year, Loren spoke at about a three-year-old level, and she attributed this substantial improvement to the reinforcement he received at the foster home.

■ Kay argues that her parenting skills were adjudged inadequate only by comparison with those of the foster parents. We have stated that "[e]vidence which compares the child-rearing skills of the mother and of the foster parents cannot alone form the basis of a finding of harm to the child, *provided the mother's efforts meet minimum standards of care.*" In Interest of J.A., 283 N.W.2d 83, 93 (N.D.1979) [quoting *In Interest of R.D.S.*, 259 N.W.2d 636, 638 (N.D.1977)]. [Emphasis supplied.] The evidence of Randy and Loren's dramatic improvement is relevant in assessing their reasonable potential for development and the correlative minimum community standards of parental care necessary to foster that development. There is clear and convincing evidence of Kay's lack of parenting skills, without comparison to the skills of the foster parents.

Kay next argues that her circumstances have changed substantially and she has improved her parenting skills since Randy and Loren were placed in foster care, but she has not been afforded the opportunity to demonstrate that she has remedied the deprivation and now can adequately parent Randy and Loren. Kay points to the fact that both Randy and Loren are now in school and Randy's health has improved, making the boys easier to care for. In addition, Bob, her husband who was retarded and had consumed much of her time and attention, died in May 1987. Kay also suggests that her two teenage sons are old enough to help her meet Randy and Loren's needs.

The juvenile court recognized, and so do we, that Kay's burdens have decreased with the death of her husband, the absence of Randy and Loren from the home and that with the help of Social Services, Kay's circumstances have improved. There was testimony that Kay had improved the conditions of her home and her appearance and was adequately caring for her three children remaining in the home. However, even considering these improvements, the juvenile court, relying on expert testimony, found that if the boys were returned to Kay, the boys would be deprived because

Kay would not be able to adequately supervise and discipline them so as to meet minimal community standards. The juvenile court also relied on witnesses who took into account Kay's improvement, but nonetheless concluded that because Kay did not understand the needs of the boys and could not consistently implement parenting skills she had been taught, she would not be able to adequately meet the needs of Randy and Loren.

Expert testimony established that to adequately meet the needs of Randy and Loren, the caregiver must understand what their special needs are and provide consistent reinforcement of their skills at home in addition to their special education. There was a great deal of testimony that Kay does not understand the special needs of the children or the extent of their disabilities and would not be able to meet the needs of Randy and Loren.

The therapist who last counseled Kay in June 1987, following Bob's death, testified that with the help of Social Services Kay had improved her situation but that her improvement in understanding Randy and Loren's needs was "very, very, very limited." A social service worker who had last visited Kay in July 1987 through a continuing parenting program, noted Kay's improvements, but concluded that she still would not be able to meet the needs of Randy and Loren.

There was all but unanimous opinion from the State's many witnesses that Kay denied the existence of serious problems, demonstrated anger at Social Services and was inconsistent in implementing the parenting skills she was taught. There was testimony that Kay was so overwhelmed by her own needs that it was difficult for her to recognize and satisfy the needs of Loren and Randy.

Dr. Peterson, a clinical psychologist who evaluated Kay, Randy and Loren, concluded that Kay did not understand the needs of Randy and Loren and explained that Kay's distrust of people interfered with her treatment and her ability to benefit by the social service programs and implement what she had been taught. Dr. Peterson found that Randy and Loren showed signs of extreme deprivation and concluded that, if the boys were returned to Kay, the home structure would disintegrate with the decreased involvement of Social Services and therefore the deprivation would continue.

Although one psychologist who tested Kay concluded she was not incapable of parenting her children, he admitted that he did not take into consideration the special needs of Randy and Loren. We therefore afford little weight to his testimony.

Prognostic evidence must show that a parent is presently unable to supply the physical and emotional care for the child, with the aid of available social agencies if necessary, and that this inability will continue for time enough to render improbable the successful assimilation of the child into a family if the parents' rights are not terminated. *In Interest of J.A.L., supra; Interest of R.W.B.*, 241 N.W.2d 546, 552 (N.D.1976).

Lack of cooperation with Social Services is pertinent to resolving whether deprivation will continue. *In Interest of R.M.B.*, 402 N.W.2d 912, 918 (N.D.1987); *McBeth v. J.J.H.*, 343 N.W.2d 355, 360 (N.D.1984). The evidence clearly and convincingly establishes that Kay's participation in social service programs was carried out with anger that hindered her progress and thwarted her success. She was unable to cooperate sufficiently with Social Services and this lack of cooperation, combined with her denial, anger and inability to understand the extent of the needs of Randy and Loren, clearly and convincingly furnish the basis for a reasonable prediction that deprivation will continue.

### 3. Harm to the Children

The record is replete with evidence to satisfy the third requirement for termination of parental rights, whether the children will suffer harm due to the continuance of the irremediable conditions and causes of deprivation. Psychologists, social workers and special education professionals testified that to return Randy and Loren to an environment that would not

provide for their special needs would be detrimental, severely impairing the children's ability to learn. They predicted that if returned to Kay's home, Randy and Loren would suffer serious mental harm.

We conclude from our analysis of the extensive record that there is clear and convincing evidence to support the juvenile court's findings. Accordingly, we affirm the order of termination of parental rights.

ERICKSTAD, C.J., and VANDE WALLE, GIERKE and MESCHKE, JJ., concur.