458 N.W.2d 303 (1990)
In the Interest of C.K.H., N.M.W., C.K.W., A.J.W., and J.W., children.
Earle R. MYERS, Jr., Richland County States Attorney, Petitioner and Appellee,
v.
C.K.H., N.M.W., C.K.W., A.J.W., and J.W., children, Respondents and Appellees, and
T.W., mother of said children, Respondent and Appellant,
W.H., father of C.K.H., Respondent, and
J.W., father of N.M.W., C.K.W., A.J.W., and J.W., Respondent and Appellant.
In the Interest of C.K.H., N.M.W., C.K.W., A.J.W., and J.W., children.
Earle R. MYERS, Jr., Richland County States Attorney, Petitioner and Appellee,
v.
C.K.H., N.M.W., C.K.W., A.J.W., and J.W., children, Respondents and Appellees,
T.W., mother of said children, Respondent, and
W.H., father of C.K.H., Respondent and Appellant,
J.W., father of N.M.W., C.K.W., A.J.W., and J.W., Respondent.
Civ. Nos. 890339, 890351.
Supreme Court of North Dakota.
July 3, 1990.
*304 Earle R. Myers, Jr. (argued), State's Atty., Wahpeton, petitioner and appellee.
Lies, Bullis & Grosz, Wahpeton, for respondents and appellees. No appearance.
David John Haberman (argued), Wahpeton, for respondents and appellants T.W. and J.W.
Krassin Law Office, Wahpeton, for respondent and appellant W.H.; argued by Don R. Krassin.
GIERKE, Justice.
This case involves appeals from a judgment terminating parental rights. We affirm.
For purposes of confidentiality, pseudonyms will be used in this opinion to identify the parents and children.
Tina (T.W.) and Walter (W.H.) were married in May 1977. They lived together for only a few weeks after the marriage and then separated. From this marriage they *305 have one daughter, Connie (C.K.H.), who was born on January 9, 1978.
Tina became acquainted with John (J.W.) while John and Walter were adjoining cellmates at a correctional facility in Iowa. Tina subsequently divorced Walter and married John. Tina and John have four children of their marriage: Nate (N.M.W.), born August 16, 1984; Cathy (C.K.W.), born October 4, 1985; Aaron (A.J.W.), born September 13, 1986; and Jed (J.W.), born September 15, 1987.
John and Tina resided together with their four children and Tina's daughter, Connie, until April 1, 1988, when the children were removed from the home and placed into temporary shelter care under an order issued by the juvenile supervisor of Richland County.
Following a hearing, the juvenile court, in an order dated October 11, 1988, determined that the five children were deprived under the provisions of the Uniform Juvenile Court Act, Chapter 27-20, N.D.C.C. The court ordered the Richland County Social Service Board, which had placed the children in private homes under foster care arrangements, to retain custody and the court ordered a home study of Tina and John's residence, a psychological and psychiatric evaluation of John, and a medical evaluation for Tina by a specialist in the area of multiple sclerosis to determine Tina's medical status regarding that disease.
A petition for termination of parental rights was subsequently filed by the Richland County State's Attorney under Chapter 27-20, N.D.C.C. Following a hearing, the juvenile court entered a judgment, dated October 20, 1989, terminating Tina's parental rights to all five children, but ordering that Connie be placed in an "open adoption" to allow her to continue to have contact with Tina. The juvenile court also terminated Walter's parental rights to Connie and terminated John's parental rights to Nate, Cathy, Aaron and Jed.
The juvenile court terminated Walter's parental rights under subsection (1)(a) of Section 27-20-44, N.D.C.C., on the ground that Walter had abandoned Connie. On appeal Walter contends that there was not sufficient evidence to establish abandonment.
In reviewing questions under the Uniform Juvenile Court Act, Chapter 27-20, N.D.C.C., we reexamine the evidence in a manner similar to a trial de novo, but we give appreciable weight to the findings of the juvenile court. In Interest of F.H., 283 N.W.2d 202 (N.D.1979).
Tina and Walter were separated shortly after their marriage in May 1977. Walter was apparently incarcerated in the State Penitentiary when Connie was born and did not learn of her birth until he was released. Tina testified that Walter resided with her and Connie for about one week after being released from prison. He then stole Tina's car and $100 that Tina had been saving for Connie, and he left the area. Since that time Walter has not had contact with or provided any support for Connie.
Tina testified that on one occasion while Walter was incarcerated in a penitentiary in Iowa, he contacted Tina on the telephone and requested that she come to see him. When she told him that she was not interested, he threatened her stating, "Well, when I ever get out of here and I find out where you're at, I'm going to rape you and [Connie], too." John testified that while he and Walter were incarcerated in the same facility, Walter said that he did not want anything to do with either Tina or Connie and on another occasion Walter said that "he was going to beat the hell out of [Tina] and rape her and whatever was necessary with [Connie]."
Section 14-07-17, N.D.C.C., provides that failure to support a child for three months is presumptive evidence of intention to abandon. An intent to abandon may be inferred from a parent's conduct, and examples of conduct that are probative of abandonment include the parent's contact and communication with the child, the failure to pay support, the parent's attitude toward parental responsibilities, and the parent's presence in the child's life. In Interest of R.M.B., 402 N.W.2d 912 (N.D.1987). A parent's incarceration is *306 not alone a defense to abandonment, and abandonment may rest upon the parent's confinement coupled with other factors such as parental neglect, absence of contact, failure to support, and disregard for the child's general welfare. In Interest of F.H., 283 N.W.2d 202 (N.D.1979).
Walter complains on appeal that his failure to have any contact with Connie is because John and Tina have prevented Walter from having contact with Connie. Under the circumstances, Walter's complaint is ludicrous. Having reviewed the record in this case, we conclude that there is clear and convincing evidence that Walter has abandoned Connie. We hold that the trial court did not err in terminating Walter's parental rights to Connie on the ground of abandonment.
The sole issue raised by John and Tina on appeal from the judgment terminating their parental rights is that there was not clear and convincing evidence that the conditions and causes of their children's deprivation were likely to continue.
The juvenile court terminated John and Tina's parental rights under subsection (1)(b) of Section 27-20-44, N.D.C.C.:
"1. The court by order may terminate the parental rights of a parent with respect to his child if:
* * * * * *
"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; ..."
To terminate parental rights, evidence of past deprivation is not enough, but rather there must be prognostic evidence that the causes and conditions of the child's deprivation are likely to continue. In Interest of R.M.B., 402 N.W.2d 912 (N.D.1987).
John and Tina are not contesting the juvenile court's determination that their children were deprived when they were removed from their home on April 1, 1988, and placed into temporary foster care. Suffice it to say that when the children were removed from the home they were suffering physically and emotionally from neglect and inappropriate disciplinary methods. In spite of warnings from the social services personnel, John and Tina continued to leave the children unattended for long periods of time with Connie, age 10 or younger, attempting to care for her basic needs as well as those of the other four small children. When the children were removed from the home they were undernourished and extremely filthy. The youngest child, Jed, was afflicted with open, weeping sores around his neck and a bad ear infection. He exhibited no emotions and lay in a completely stiff fashion. There is evidence that the children were whipped with a belt by John for such things as wetting their pants, and one licensed daycare provider testified that John told her he would take a "wet crappy diaper" and make Nate wear it around his neck to bed as punishment for dirtying his pants.
John and Tina assert that the causes and conditions of their children's deprivation are not likely to continue because there have been positive changes. Tina asserts that when the children were removed from their home she was hospitalized with what was initially diagnosed as a stroke and subsequently diagnosed as multiple sclerosis. She asserts that a treatment program has been administered for her and that with some assistance she believes that she is now capable of taking care of her children. John asserts that when the children were removed from the home he was in a wheelchair recovering from knee surgery and was working more than one job outside the home to obtain sufficient income to support the family. He contends that for those reasons he was unable, with Tina in the hospital, to adequately care for the children. John asserts that he and Tina are now capable of caring for the children in their home. There is considerable contrary evidence to these assertions by John and Tina.
Tina was raised in a dysfunctional family unit. She has an I.Q. of 71 and a mental *307 age of 12.4. Dr. Richard Bailly, a neurologist at the Fargo Clinic, has diagnosed Tina as having multiple sclerosis. Tina has experienced "cognitive problems" as a consequence of this disease, such as poor memory and comprehension and inability to adequately process information and make good judgments. Dr. Bailly testified that these problems would make it difficult for Tina to manage the household and take care of her children. Dr. Patrick Konewko, a clinical neuropsychologist at the Fargo Clinic, testified that multiple sclerosis is a permanent condition for Tina. Dr. Konewko also testified that after considering such factors as Tina's long history of learning disabilities, her multiple sclerosis condition, and her family situation, that Tina "would have a very difficult time managing her children." Dr. R.P. Ascano testified that therapy is a cognitive process and, consequently, the prognosis for Tina being able to implement therapy and parenting classes is very poor.
Dr. Ascano testified that "perhaps" Tina's parental capacity could be evaluated after she has had two or three years of therapy to address her problems. However, as an alternative to parental termination, assisting a parent to establish an adequate environment for the children by offering long term and intensive treatment is not mandated if it cannot be successfully undertaken in a time frame that would enable the children to return to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care. In Interest of R.M.B., 402 N.W.2d 912 (N.D.1987); In Interest of J.K.S., 356 N.W.2d 88 (N.D.1984).
John also comes from a dysfunctional family, and the record does not indicate that John has been willing to cooperate in learning appropriate parenting methods. In spite of repeated warnings by social service workers that Connie must not be left by herself to care for the four younger children, John continued to make Connie do so.
Dr. Ascano responded affirmatively when questioned as to whether John's MMPI test results show that he has a personality that is self-centered, selfish, and egocentric. Dr. Ascano testified that John's test scores show that he would be extremely resistant to any form of traditional therapeutic intervention. During March 1989 John wrote a letter to Connie Jensen, a child protection worker for the Richland County Social Services Agency, clearly indicating that he would no longer cooperate with the social service workers. Although lack of parental cooperation with social workers may be insufficient by itself to demonstrate that a child is deprived, once deprivation is established, a lack of parental cooperation is pertinent to the issue of whether deprivation will continue. In Interest of R.M.B., 402 N.W.2d 912 (N.D.1987).
There is also evidence in the record to support the juvenile court's finding that John is in need of treatment for chemical addiction but has in the past been unwilling to cooperate in getting the treatment that he needs.
Having reviewed the entire record in this case, we believe that there is clear and convincing evidence that the causes and conditions of the children's deprivation are likely to continue and result in the children suffering serious physical and emotional harm if they are returned to John and Tina's home.
The evidence shows that these children have responded affirmatively while in foster care and are overcoming the physical and emotional scars that they suffered while living with John and Tina. The record also indicates that the children are now capable of being permanently placed in adoptive homes where they can continue to heal and thrive in an environment offering proper care and attention. Although there is some evidence that with long and intensive therapy and assistance, John and Tina might be able to learn and apply proper parenting skills, their children cannot be expected to wait and assume the risks involved.
The judgment is in all respects affirmed.
ERICKSTAD, C.J., and VANDE WALLE, J., concur.
*308 LEVINE, Justice, dissenting in part and concurring in part.
This is a troublesome case because the conduct of the mother, T.W., is not, by any stretch of the imagination, as culpable or opprobrious as that of the father, J.W. However, the mother has multiple sclerosis, is dependent on the father, and has made no effort to establish either a life or a defense separate and apart from the father. What then do we do when termination of parental rights is clearly justified for one parent, but not so clearly for the other, and the couple not only willingly shares bed and board but also the same attorney. I see their interests as adverse but, apparently, they did not and still do not. "A client may consent to representation notwithstanding that there might be a conflict." Comment, Rule 1.7, North Dakota Rules of Professional Conduct. However, NDCC § 27-20-26(1) requires the appointment of separate counsel "[i]f the interests of two or more parties conflict." Under the statute and as a policy matter, I believe the trial court should have appointed separate counsel for each party, that is, for T.W. and J.W. Therefore, I would reverse as to T.W., the mother, and J.W., the father of the four younger children, and affirm as to W.H., the father of the oldest child.
The petition for termination alleged J.W.'s inappropriate reliance on the eldest child to provide care for the younger children when his wife, T.W., was hospitalized. He left the children unattended on several occasions for reasons that were far from compelling, thereby leaving the youngsters in dire need of adult care and supervision. The petition also alleged inappropriate discipline and verbal abuse by the father. It detailed his attempt to suffocate the youngest child. The petition also described his chemical addiction, his refusal to undergo counseling and his denial of the seriousness of his problem. That each of these charges is serious unto itself is dramatically underscored when compared with the allegations against the mother, namely, that both parents "require the oldest child to miss school to care for the younger child" and that the mother's multiple sclerosis disabled her from caring for the children.
The petition should have alerted the trial court of the need for each parent to rely on different defenses, likely antagonistic to the interests of the other spouse. I am concerned, as a matter of common sense, over the ability of a single attorney to counsel two clients whose interests likely will diverge. To put it plainly, when a defense may require one spouse to choose between marriage and child custody, or to attack the other's conduct or credibility, I seriously question whether a single lawyer representing those two spouses can adequately counsel or vigorously represent each client's interests to the extent our system of advocacy calls for. Section 27-20-26(1) should be read to require separate counsel in a case such as this. As for Rule 1.7, NDRProfR, even assuming that the attorney advised the husband and wife of these potential conflicts and assuming that the parents knowingly waived their rights to separate counsel, I believe that as a matter of sound policy and fair administration of justice, we should not place the burden of informing on the attorney or the burden of choosing to waive on the parties. Instead, in a parental termination proceeding, the trial court should appoint counsel for each party under the circumstances of this case.
Accordingly, I respectfully dissent from the judgment affirming the order terminating the parental rights of T.W. and J.W. and would reverse and remand for a new trial with separate counsel to be appointed. I concur in the judgment insofar as it affirms the termination of the parental rights of W.H., father of the eldest child.
MESCHKE, J., concurs.